# Illinois Official Reports

## Appellate Court

---

### *People v. Mandoline*, 2017 IL App (2d) 150511

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TODD J. MANDOLINE, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-0511 |
| Filed | February 21, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 12-CF-1455; the Hon. John J. Kinsella, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Douglas H. Johnson and Kathleen T. Zellner, of Kathleen T. Zellner & Associates, P.C., of Downers Grove, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Lisa A. Hoffman and Edward R. Psenicka, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justices Burke and Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1     Following a jury trial in the circuit court of Du Page County, defendant, Todd J. Mandoline, was convicted of first degree murder (720 ILCS 5/9-1(a)(3) (West 2012)) and aggravated arson (720 ILCS 5/20-1.1(a)(2) (West 2012)), and he was sentenced to consecutive terms of imprisonment of 27 years for murder and 12 years for aggravated arson. Defendant appeals, arguing that (1) probable cause did not exist for his arrest; (2) defendant did not voluntarily reinitiate questioning with the police after the initial interrogation had ceased due to his invocation of his right to counsel; (3) his statements to the police were not voluntary, knowing, and intelligent; (4) his statements were obtained in violation of section 103-2.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-2.1 (West 2012)), which requires the electronic recording of custodial interrogations in murder investigations; and (5) the trial court erroneously refused a jury instruction bearing on the proximate-cause theory of felony murder. We affirm.

¶ 2                                   I. BACKGROUND

¶ 3     We summarize the pertinent facts adduced during the hearings and the trial in this matter. Early in the morning on July 22, 2012, Paula Morgan died in a fire at her home in Lombard, Illinois; Jason Cassiday was burned over 40% of his body and experienced life-threatening pulmonary injuries due to inhaling smoke and combustion products, but he survived the fire. The fire began in Morgan's car: a piece of paper had been inserted into the gasoline fill tube of the car and ignited. The car was parked in the driveway of the home, almost inside of the garage. The garage door was open, and the door to the mudroom, off of the garage, was also open. A whole-house fan, which was apparently operating at the time of the fire, pulled smoke and flames into the garage and the house. The car and the garage were largely consumed by the fire; the upstairs rooms of the house were heavily damaged.

¶ 4     On Saturday, July 21, 2012, Morgan's parents left on an out-of-town trip. That night, Morgan had a birthday party. Defendant, who had been in an intimate but up-and-down relationship with Morgan, attended. As the party progressed, defendant became agitated because he apparently believed that he and Morgan would spend the night alone together, and he was upset when she had a large birthday party. At some point during the party, defendant and Morgan began to argue. Defendant demanded the return of a necklace he had given Morgan; there was some shoving, and partygoers separated defendant and Morgan. Defendant spoke with Ricardo Sanchez for an hour or more. Eventually, Morgan surrendered the necklace to defendant, and Matt Schopa drove defendant away from the party. At some point, either during defendant's initial confrontation with Morgan or as he was leaving the party, he stated, "I hope you all die."

¶ 5     At about 2 a.m. on July 22, 2012, Salman Jaffer, who lived across the street from the Morgan home, left his home to work out. Jaffer explained that he was observing the Muslim holiday of Ramadan, which required fasting during the daytime, so he had flipped his schedule and ate and was active at night. He noticed a car that he did not recognize from his neighborhood parked across from his house. He returned from his workout at about 3 a.m. and noticed that the car was no longer there. However, when interviewed by the police, he stated that the car was still present when he returned from his workout. Sometime between 3:30 and 4 a.m., Jaffer heard the sound of breaking glass. Fearing that he was being harassed, he doused

the lights and then noticed an orange glow. He observed that Morgan's car was on fire and called 911. Jaffer attempted to help, but he was advised by the emergency operator to back away when the tires on Morgan's car began to explode.

¶ 6 At about 3 a.m., Asgar Mohammed, another neighbor observing the holiday of Ramadan, left his house to go to the grocery store. He encountered a brown-haired white male with a scruffy beard and exchanged a greeting with him. The man was wearing a light-colored shirt and baggy, light khaki short pants. Defendant was observed at the party wearing clothes matching that description. Mohammed also noticed a suspicious car and noted that the person in the car was not the same person with whom he had exchanged a greeting.

¶ 7 Police and fire personnel responded to the fire. Police began the process of investigating the circumstances of the fire.

¶ 8 At about 5:30 a.m. on July 22, 2012, Detective Sergeant John Malatia of the Lombard police department reported to the Morgans' house. At that early time, no one had determined the cause of the fire. Malatia noted the damage to the house and to Morgan's car and returned to his office. The police began bringing the partygoers into the police department for interviews.

¶ 9 Detectives Gouty and Grage of the Lombard police department interviewed Sanchez. Sanchez had observed the altercation between defendant and Morgan and explained that he had interposed himself and restrained defendant. Sanchez confirmed that defendant had stated, "I wish you all die" or "I hope you all die." Sanchez also related that, later, he had seen someone in the shadows. Although Sanchez was not able to provide a description of the individual in the shadows, he believed that it was defendant returning to the party.

¶ 10 Another partygoer, Matt Allen, was interviewed by Lieutenant Abenante of the Lombard police department. Allen related that there was no physical altercation between defendant and Morgan. Allen also had seen someone in the shadows before the discovery of the fire; Allen did not say that he had seen defendant.

¶ 11 At around 6:20 or 6:30 a.m., Malatia spoke to Jaffer. Malatia learned that Jaffer had not seen anyone who seemed responsible for the fire when Jaffer discovered it. Jaffer informed Malatia that he had seen a Hyundai Tiburon parked near Morgan's house before the fire but that the car had departed by the time he discovered the fire.

¶ 12 At 6:32 a.m., Malatia and Detective Terrence Evoy of the Lombard police department interviewed Schopa. Schopa told the detectives that he had attended Morgan's birthday party the previous evening. Schopa related that defendant and Morgan argued about a necklace defendant had given to Morgan. Schopa also noted that defendant stated that he hoped Morgan died or that he wanted everyone to die but Morgan might not have been present for the statement. Schopa told the detectives that he interceded with Morgan about the necklace and she gave him the necklace to return to defendant. Schopa also informed the detectives that, at around 1:30 a.m., he had driven defendant away from the party, dropping defendant off on his street. Schopa drove the detectives along the route he used to drive defendant away. The detectives determined that Schopa had dropped defendant off about three houses short of defendant's residence.

¶ 13 The police investigating the fire held a brief meeting to exchange what they had learned. After this meeting, Malatia sent Detectives Harris and Balsitis of the Lombard police department to defendant's home. Malatia, accompanied by Evoy, followed the other two

detectives to defendant's home, arriving as Harris and Balsitis were speaking to defendant on his front porch.

¶ 14    At around 7:15 a.m., Harris and Balsitis arrived at defendant's home and knocked on the front door. They were greeted by defendant's mother and informed her that they wished to speak with defendant. Defendant's mother woke defendant, and he joined Harris and Balsitis on the porch. At this point, the detectives did not inform defendant that Morgan had died, but they stated that they were investigating a fire that had occurred at Morgan's house earlier that morning. Defendant admitted that he had attended Morgan's party the night before, but he asserted that he had left the party early because he did not get along with some of the other partygoers.

¶ 15    As Harris and Balsitis were talking with defendant, Malatia and Evoy arrived. The record is unclear as to who made the request, but one of the detectives asked defendant to come to the police department, and defendant agreed. Defendant asked that he be allowed to go to the bathroom and to get dressed.

¶ 16    Defendant went back into his house, and Harris and Balsitis accompanied him. Harris watched defendant retrieve his footwear, and Balsitis stayed near defendant's bathroom as he relieved himself. Defendant put on the same clothes he had worn to the party. The detectives noted that these clothes were very wet and that defendant appeared to have sweated heavily in the clothes, perhaps from running. Harris was asked whether he watched defendant use the bathroom, and Harris denied that he had done that. Harris was asked whether Balsitis asked defendant to keep the bathroom door open, and Harris was unsure whether that occurred or even whether the bathroom door was open. Harris surmised that, if the bathroom door were left open, Balsitis might have asked defendant to leave it open, but Harris was unsure. After defendant grabbed his footwear, wallet, and keys, defendant exited his home and got into the unmarked police car in which Malatia and Evoy arrived. The record does not indicate that defendant was patted down before entering the car.

¶ 17    At about 7:23 a.m., they arrived at the police department, and defendant was escorted to an interview room. Before entering the room, Malatia searched defendant and removed defendant's phone and wallet, placing them in a cubby.

¶ 18    The interview room was approximately five feet by five feet. At about 7:43 a.m., Malatia, with Evoy present, read defendant his *Miranda* rights. Defendant immediately asked, "If I had an attorney, would I have to wait then? Would I have to sit here?" Malatia replied, "Yeah, obviously." During the ensuing conversation, defendant related that his and Morgan's relationship "wasn't going very well." Defendant was upset that he and Morgan had not been spending time together. Malatia directly questioned defendant about the altercation with Morgan at the party, but defendant initially denied it. Malatia informed defendant that everyone at the party had mentioned an altercation, and defendant then admitted that he had gotten into an argument with Morgan, but he said that he could not recall the details, such as why they were arguing, what they were arguing about, how it started, or whether he pushed Morgan. Defendant denied any memory of making threats or cursing out Morgan or any of the other partygoers, but defendant admitted that, in a text message, he called Morgan a "whore." Defendant denied that he returned to the party after Schopa drove him away.

¶ 19    At about 8:18 a.m., defendant stated, "Now, I'll call my lawyer. You want to say you got this on me. You want to say whatever and try to pin me down, now, I'll talk to my lawyer." The

detectives did not discontinue the questioning. Instead, Malatia continued, saying, "We're trying to figure out what happened."

¶ 20    At about 8:26 a.m., both Malatia and Evoy left defendant alone in the interview room. At about 8:44 a.m., Evoy returned to the interview room because defendant had opened the door and set off an alarm. At that point, Evoy told defendant that he was not allowed to leave.

¶ 21    At about 9:11 a.m., defendant said, "I've said everything I'm going to say. Can I get my cigarettes, call my mom, and get a ride?" Malatia told defendant that he could not leave. Defendant asked why he could not leave, and Malatia told him that they had to get to the bottom of the incident. Defendant asked if he could retrieve his lawyer's phone number, and Malatia and Evoy agreed to let him do that at a later time, but defendant was never allowed to retrieve his lawyer's number or to call his lawyer. At about 9:12 a.m., defendant reiterated that he had asked for a lawyer.

¶ 22    At about 9:21 a.m., defendant was taken out of the interview room and allowed to smoke (the first smoking break). Because no smoking was allowed in the police department, defendant was taken outside. The spot to which defendant was taken was a blind spot for the security cameras located on the outside of the department. In any event, even if defendant had been taken to a place the security cameras covered, any verbal interaction would not have been recorded because the cameras were not equipped to make audio recordings.

¶ 23    Defendant was accompanied outside by Malatia and Evoy during the first smoking break. Malatia and defendant spoke generally about defendant and also about the case. Defendant asked about what happened at the Morgans' house and how the fire had started. Malatia told defendant that he did not know. Defendant asked if he could call his mother for a ride and mentioned the name of his lawyer. Malatia told defendant that he knew defendant's lawyer. Defendant also asked when he would be able to leave, but Malatia put him off, telling him that he could not yet leave. Neither Malatia nor Evoy prepared a report about the conversation with defendant during the first smoking break. At around 9:32 a.m., defendant was returned to the interview room. The detectives did not readminister the *Miranda* warnings.

¶ 24    The questioning continued. At about 9:59 a.m., defendant told the detectives that there was nothing else they needed to know. The detectives inquired whether there was anything else defendant wished to tell them, and defendant once again mentioned his attorney. Evoy attempted to get defendant to talk further, suggesting that defendant and the police would not be able "to fix things" if defendant were not forthcoming. Defendant responded, "I told you everything from my point of view. I told you everything." The questioning continued.

¶ 25    At about 10:11 a.m., Evoy told defendant that incorrectly answering "questions that we already know the answers to does not help [you]," and he urged defendant to be truthful. Defendant then reminded the detectives that he had asked for a lawyer, saying, "I said I did want my lawyer, but you never came back and asked questions about that." Malatia told defendant that he was not allowed to call his mother, and defendant replied, "I can call my dad to get somebody's number to call my lawyer."

¶ 26    The questioning continued. Malatia and Evoy continued to use psychological pressure and urge defendant to give truthful responses, with Evoy warning defendant, "the more we dig, the more we're going to continue to dig, the worse it's probably going to be for you." At about 10:25 a.m., defendant once again asked for a lawyer. This time, Malatia finally recognized that defendant had invoked his right to counsel, and the detectives terminated the questioning and

left the interview room. However, they left defendant in the interview room while they completed other tasks related to the investigation.

¶ 27 During the interlude, Malatia and Evoy interviewed Mohammed about his observations before the fire. After about 15 minutes, the detectives wrapped it up. Evoy escorted Mohammed to the front of the police department. As they were walking, Evoy retrieved copies from the printer, placing them on top of the folder he was carrying. The copy on top was of a picture of defendant taken earlier that morning. Evoy did not attempt to show Mohammed the picture, but since it was on top of the papers he was carrying, Mohammed noticed it. He told Evoy that the picture was of the man he had seen the night before. Evoy apparently did not create a report to memorialize the exchange; moreover, Evoy did not bring Mohammed back to an interview room and attempt to conduct a photo lineup to see if Mohammed could still make an identification. Instead, he escorted Mohammed to the doors and let him depart.

¶ 28 At around 11:30 a.m., defendant knocked on the door of the interview room and requested permission to use the restroom and to smoke a cigarette. Defendant was taken to the restroom, returned momentarily to the interview room, and then taken outside to the same spot where he had smoked earlier (second smoking break).

¶ 29 According to Malatia, during the second smoking break, defendant asked what was occurring in the investigation. Malatia believed that defendant asked this about five times; each time, he or Evoy told defendant, "based on his request for an attorney, we couldn't answer those questions anymore." Defendant then asked when he would be able to leave. Malatia informed defendant that he "was going to be there for a while." Malatia explained to the court that, in his opinion, defendant was in custody by the time of the second smoking break.

¶ 30 Defendant asked what they needed to do to talk about his case again. Malatia testified that he explained to defendant:

> "[I]n order to talk about the case again, *** he would have to formally say he didn't want to talk to an attorney anymore. We would have to go inside the police department, fill out paperwork to that effect, and we would have to read him his rights again, and we would have to start all over from scratch there."

Defendant agreed to the procedure that Malatia had outlined.

¶ 31 At about 11:36 a.m., defendant was taken back to the interview room. Malatia announced that defendant had earlier asked for an attorney. Malatia asked defendant if he wanted to speak with the detectives. Defendant replied, "I'll talk to you." Defendant signed a preprinted form revoking his previous invocation of his right to an attorney. Defendant, both orally and in writing, then waived his right to an attorney. Additionally, defendant was once again Mirandized.

¶ 32 The questioning resumed. At about 11:46 a.m., Evoy informed defendant that he knew that defendant was involved, and he urged defendant to tell the truth so that he could move defendant "to the next level and get [him] out of here." Defendant asked what would happen if he were to "remember doing it." Malatia replied that, in the worst case, defendant would be arrested and charged and would have to go to court. To further press defendant, Malatia warned him that, if the police were required to continue investigating the incident, it would be "more difficult for [defendant] to minimize things." Evoy added that, if defendant were to confess and take responsibility for his actions, the judge and the State's Attorney would take it into account. At about 11:50 a.m., defendant conceded that he had returned to Morgan's home,

saying that he "went and spied." Defendant continued to maintain that he had not started a fire after he returned to Morgan's neighborhood.

¶ 33    At about 12:07 p.m., Malatia informed defendant that the experts were, at that moment, determining how the fire had started. Malatia told defendant that he was trying to get to the heart of the matter. Defendant continued to deny that he started Morgan's car on fire: "I don't know [inaudible] fire, though. Fuck, I had no gas. If I fucking—I didn't walk up to the car with a fucking lighter or nothing."

¶ 34    After about another hour, at about 1:10 p.m., defendant was taken from the interview room for another smoking break (third smoking break). Detectives Chudzinski and Gouty of the Lombard police department escorted defendant out the back door near the garage. Chudzinski made small talk with defendant while defendant smoked. They discussed defendant's employment, where he went to school, and his attempts to stop smoking. Defendant also asked Chudzinski if he could go home by posting a recognizance bond. Chudzinski told defendant that Malatia and Evoy still wanted to speak with him. After defendant had smoked, he was returned to the interview room. Defendant was left alone in the interview room for about an hour.

¶ 35    At about 2:30 p.m., defendant requested another chance to smoke. Chudzinski, accompanied by Detective Porrata of the Lombard police department, took defendant outside for another smoking break (fourth smoking break). According to Chudzinski, they once again engaged in small talk focusing on defendant's employment, but he did not ask defendant any questions related to the case. Chudzinski testified that they spoke about defendant engaging in painting jobs with his father. At some point during the fourth smoking break, defendant asked where Malatia and Evoy had gone. Chudzinski told defendant that Malatia and Evoy had gone to Morgan's house and were meeting with other investigators and evidence technicians. Defendant asked what kind of evidence they were looking for. Chudzinski related that he did not know because he had not visited the scene; however, he continued, when Malatia and Evoy returned to the police department, they would still wish to speak with defendant, and Chudzinski advised defendant to "be honest with them." At about 2:42 p.m., Chudzinski returned defendant to the interview room. Once there, defendant remained alone.

¶ 36    At about 2:57 p.m., Malatia and Evoy once again entered the interview room. Evoy demanded that defendant "come clean right now"; Malatia informed defendant that the police knew absolutely how the car started on fire. Both detectives repeated that they knew the origin of the fire and pressed defendant to "come clean." At about 2:59 p.m., defendant stated that he lit a piece of paper on fire and put it in the gas tank.

¶ 37    At about 3:20 p.m., Chudzinski and Detective Ranallo of the Lombard police department took defendant from the interview room for another smoking break (fifth smoking break). Chudzinski, following Malatia's instructions, took defendant to smoke in the garage. Chudzinski explained that defendant was taken into the garage instead of outside because defendant had admitted his involvement in the fire. Additionally, unlike the other four smoking breaks, the fifth smoking break occurred in an area that was monitored by the outside surveillance cameras at the police department, although the camera monitoring the garage area was still unequipped to record any audio. Defendant asked Chudzinski if he would be able to "do SWAP [Sheriff's Work Alternative Program] time" while he was in the county jail for this case. Chudzinski told defendant that he did not know and returned defendant to the interview room.

¶ 38    Contrasting with the recollections of the various police officers, defendant had a somewhat different version of the events and the smoking breaks. During the first smoking break, defendant asked Malatia and Evoy when he would be able to call a lawyer and when he would be able to go home. Malatia asked defendant the name of his lawyer, and defendant told him. Malatia acknowledged that he knew defendant's lawyer, but Malatia told defendant that his lawyer would probably not answer his call and that, even if he did answer, he would not come to the police department on a Sunday morning. Defendant persisted in his requests to call his lawyer, but Malatia did not allow him to make a call. Malatia also did not respond to defendant's request to go home.

¶ 39    Testifying about the second smoking break, defendant maintained that he again asked to call his attorney and again asked when he would be able to go home. According to defendant, Malatia stated that he could not contact his attorney and that the only way defendant would be able to go home was if he decided to speak with the detectives again. Defendant explained why he agreed to resume talking with the detectives:

> "Outside, [Malatia and Evoy] told me that was my only option of going home. I felt that I really had no options. They flat out told me I couldn't call my lawyer; I couldn't make a phone call, period; I couldn't call my mother. But they had blatantly ignored me all day."

Defendant testified that Malatia instructed him about how they would have to proceed in order to resume speaking with defendant. According to defendant, Malatia explained that defendant would have to once again expressly waive his right to an attorney; the detectives would ask defendant a series of questions, and defendant would have to convey that he knowingly wanted to speak to the detectives and that he had asked to speak with the detectives in the first place. Defendant further related that Malatia explained to him that all of these procedures were going to be videotaped so that they could be verified.

¶ 40    Defendant explained that the reason he did not bring up the purported promise that he would be able to go home was that it was not part of the agreement he had made with Malatia during the second smoking break. Defendant elaborated on Malatia's instructions, maintaining that Malatia told him what he needed to say in response to the questions that he would be asked when they were back in the interview room and before the camera. According to defendant, Malatia told him that he had to go into the interview room and waive his right to an attorney. Defendant would then be asked if he had approached the detectives and asked to speak about the case, to which he was going to have to answer, "Yes."

¶ 41    According to defendant, during the second smoking break, Malatia was "adamant" about speaking with defendant about the investigation even as he stonewalled defendant's inquiries about the investigation by claiming that he was not allowed to speak with defendant because defendant had asked for a lawyer. Defendant believed that Evoy cautioned Malatia that neither of the detectives should be talking with defendant. Finally, defendant noted that he had not been informed that anyone had perished in the fire; rather, the detectives told him that insurance would cover the damage to Morgan's car and that he would be allowed to go home.

¶ 42    After the questioning was complete, defendant's attorney arrived at the police department. The attorney was allowed to speak with defendant.

¶ 43    Defendant was charged with aggravated arson and murder. Later, a superseding indictment was filed, charging defendant with first degree murder, aggravated arson, and other offenses

stemming from the fire. During the investigation, the forensic pathologist determined that Morgan had died from inhaling smoke and other combustion products caused by the fire.

¶ 44     In an open lot next to Morgan's house, police recovered a cigarette butt. Genetic testing on the cigarette butt determined the presence of defendant's genetic material. In addition, police recovered two water bottles, each of which contained a liquid and bits of aluminum foil. The police later determined that they were like "Drano" or "MacGyver" bombs, in which the aluminum foil undergoes a reaction with Drano or some other caustic liquid, releasing heat and causing pressure to build up in the bottle until it bursts. The bottles did not appear to have burst, but they appeared to have tiny holes that would have allowed the pressure to escape without bursting them. Testimony at trial indicated that, while the chemical reaction between the aluminum foil and the caustic liquid produced heat, it would not have caused a flame to result. Rather, the danger of this sort of device is the build-up of pressure in the bottle. When the bottle bursts, the heated caustic liquid will splatter about and injure anyone on whom it lands.

¶ 45     The case advanced. Defendant filed a motion to quash his arrest, contending that the police did not have probable cause to arrest him. After hearing the evidence summarized above about the investigation, the trial court denied the motion to quash the arrest. The trial court held that defendant was not in custody until 8:44 a.m., when he attempted to leave the interview room and was informed that he was not allowed to leave. The trial court then determined that there was probable cause to justify defendant's custody. In particular, the trial court noted that the facts giving rise to probable cause included that defendant participated in a heated argument with Morgan at the party; defendant and Morgan were in a volatile relationship; defendant and Morgan's relationship was deteriorating at the time of the offense; at the party, defendant was upset because he had expected to be alone with Morgan but she had arranged a large birthday party; at the party, a possible romantic rival was in attendance and spending time with Morgan; defendant had threatened the partygoers; shortly after the heated argument, Morgan's car was set on fire; defendant's clothes were sweaty, which was consistent with the police hypothesis that defendant was involved in setting Morgan's car on fire and running back to his home; the partygoers believed that defendant was lurking in the shadows, despite the lack of a solid identification; and likewise the partygoers believed that defendant set Morgan's car on fire. The trial court concluded that defendant had motive and opportunity and that the police investigation to that point reasonably supported the focus on defendant.

¶ 46     Defendant also filed a motion to suppress his statements to the police, based on the violations of his rights to remain silent and to counsel. After a hearing in which the parties presented the above-summarized evidence on the circumstances of the interview, the trial court granted in part and denied in part the motion to suppress the statements. The trial court specifically determined that, at 8:18 a.m., defendant first invoked his right to speak with counsel and this should have caused the questioning to cease but did not. The court suppressed the statements made between 8:18 and 10:26 a.m. The court also determined that, during the second smoking break, at about 11:30 a.m., defendant reinitiated discussing the investigation with the police and, thereafter, knowingly waived his rights to remain silent and to counsel.

¶ 47     The trial court specifically held that defendant's statement, at 8:18 a.m., "I told you what happened then. Whatever. I know. Whatever. I will talk to my lawyer now," was "an invocation of counsel. [The trial court did not] think it could be too much clearer. [The trial court did not] think it[ was] ambiguous. And certainly, at that point the interview or the questioning or interrogation should have stopped. But it did not."

- 9 -

¶ 48    The trial court noted that the questioning was not harsh or heavy-handed, and it noted that defendant had demonstrated throughout the improper questioning that his will appeared to be unshaken. When the police did finally honor defendant's invocation of his right to counsel, defendant sat alone in the interview room for an hour. The trial court considered that "one of the primary motivations [is that] defendants always want to know what the police know [and to know] what's going on." The trial court believed that this desire to know what is going on caused defendant to reach out to the police. The court determined, as a matter of fact, that defendant "initiated a conversation reflecting his desire to engage in a generalized discussion of the case."

¶ 49    The trial court weighed the testimony of the police and defendant before determining, as a matter of fact, that the version given by the police tended to match up with the facts while defendant's version did not. Particularly, the trial court noted that defendant had testified that he wanted to leave and that the police informed him that the only way he could leave was by agreeing to speak with them. However, during the "hours of interview," defendant never mentioned "that, hey, wait a minute, you told me that, if I talked to you, I could go home or you were going to get my lawyer here or anything like that." The trial court reasoned that defendant was attempting to play a cat-and-mouse game with the police by trying to learn "what was going on" while not "say[ing] too much."

¶ 50    The trial court considered the police misconduct, notably defendant's ignored requests to call a lawyer, but the trial court held the misconduct not to be dispositive. Instead, the trial court considered all the improper questioning and other misconduct in determining whether defendant reinitiated the discussion. The trial court held that defendant did reinitiate, which transformed the inquiry into whether defendant knowingly and voluntarily waived his right to counsel following his attempt to reinitiate. The trial court noted that defendant was once again read his *Miranda* rights before the questioning resumed and that he knowingly and voluntarily waived his rights to counsel and to remain silent, rendering admissible the statements made after about 11:30 a.m.

¶ 51    Defendant filed a motion to reconsider the denial of his motion to suppress his statements. The trial court heard and denied the motion, reiterating that, at about 11:30 a.m., defendant revoked his previous invocation and knowingly and voluntarily waived his *Miranda* rights.

¶ 52    Shortly before the trial began, defendant filed a motion to suppress Mohammed's out-of-court identification of defendant when Mohammed viewed defendant's picture in Evoy's stack of papers. Following a hearing, the trial court granted the motion to suppress, holding that, whether done intentionally or inadvertently, the method was unduly suggestive. The court also held, however, that apart from positively identifying defendant, Mohammed would be able to testify about the things he saw, including describing the person he observed. The trial court further commented that the manner in which the picture was shown to Mohammed was "very troubling" and that Evoy's failure to document the identification was "baffling."

¶ 53    The case advanced to trial. At the close of the evidence, the trial court and the parties conferred about the jury instructions. Defendant offered Illinois Pattern Jury Instructions, Criminal, No. 7.15A (4th ed. Supp. 2011) (hereinafter, IPI Criminal 4th No. 7.15A (Supp. 2011)), regarding the foreseeability of a death resulting from an underlying felony. The State objected, and the trial court refused the instruction.

¶ 54 Following its deliberation, the jury returned guilty verdicts on the charges of first degree murder and aggravated arson. Defendant was subsequently sentenced to consecutive terms of 27 years for the murder and 12 years for the aggravated arson. Defendant timely appeals.

¶ 55 II. ANALYSIS

¶ 56 On appeal, defendant argues that the trial court erred in deciding the pretrial motions to quash his arrest and to suppress his statements. Specifically, defendant argues that probable cause to arrest was lacking, so the trial court erred in denying the motion to quash his arrest. Defendant also argues that he did not voluntarily reinitiate the discussion with the police after earlier invoking his right to counsel; moreover, his second waiver of the right to counsel was likewise involuntary. Defendant also argues that the police tactics throughout his interrogation rendered his statements involuntary. In addition, defendant argues that the police violated section 103-2.1 of the Code (725 ILCS 5/103-2.1 (West 2012)) by failing to electronically record his smoking breaks. Finally, defendant argues that the trial court erroneously refused his jury instruction regarding causation and foreseeability. We consider each contention in turn.

¶ 57 A. Probable Cause to Arrest

¶ 58 Defendant initially argues that the trial court erred in denying his motion to quash his arrest. In reviewing the trial court's judgment on a motion to quash, we apply a bifurcated standard. See *People v. Gomez*, 2011 IL App (1st) 092185, ¶ 54. We accord deference to the trial court's findings of historical fact and will disturb those findings only if they are against the manifest weight of the evidence. *Id.* We review *de novo* the ultimate question of the outcome of the motion to quash. *Id.*

¶ 59 Defendant argues that the trial court erred in concluding that he was arrested at about 8:44 a.m., when he opened the door to the interview room, asked to leave, and was told that he was not allowed to leave. Instead, according to defendant, he was placed under arrest at his home. In any event, defendant maintains, he was under arrest no later than when he was first placed into the interview room, at about 7:37 a.m. Defendant further contends that the police did not have probable cause to arrest him at his home, when he was placed into the interview room, or even at about 8:44 a.m. Defendant's contentions thus raise two distinct questions that we must answer: (1) when was defendant placed under arrest, and (2) did the police have probable cause to arrest him when he was placed under arrest?

¶ 60 As an initial matter, the State argues that defendant procedurally defaulted the issue of when the arrest occurred. The State argues that defendant confined his arguments in the trial court to whether probable cause existed for an arrest occurring at 8:44 a.m., thereby forfeiting any contention that he was arrested when he was approached by the police at his home or when he arrived at the police department. We disagree. A review of the record demonstrates that defendant adequately argued that he was arrested at his home and, if not at his home, then upon arriving at the police department and, in any event, no later than 8:44 a.m. By adopting alternative arguments, defendant adequately preserved the issue of when the arrest occurred, and we will address defendant's arguments.

¶ 61 Turning to the question of when the arrest occurred, we note that the overarching consideration is whether, under all of the circumstances present, a reasonable, innocent person would conclude that he or she was not free to leave. *Id.* ¶ 58. This test is objective. *Id.* A

- 11 -

person's decision to voluntarily accompany police officers means that he or she has not been arrested. *Id.*

¶ 62    In considering whether an arrest has occurred, the court is to consider the following factors: (1) the time, place, length, mood, and mode of the encounter between the defendant and the police; (2) the number of police officers present; (3) any indicia of formal arrest or restraint, such as whether the officers used handcuffs or drew their guns; (4) the officers' intention; (5) the defendant's subjective belief or understanding; (6) whether the defendant was informed that he or she could refuse to accompany the officers; (7) whether the defendant was transported in a police car; (8) whether the defendant was informed that he or she was free to leave; (9) whether the defendant was informed that he or she was under arrest; and (10) the language used by the officers. *Id.* ¶ 59. No single factor is dispositive. *Id.*

¶ 63    Pursuant to defendant's arguments, there are three possible times at which the arrest occurred: at his house, upon his arrival at the police department, and at 8:44 a.m., when he was informed that he would not be allowed to leave. The parties agree that defendant was under arrest no later than 8:44 a.m. Therefore, we analyze whether defendant was arrested at his home or upon arriving at the department, in light of the factors set forth above as well as the overall circumstances present.

¶ 64    Turning first to whether defendant was arrested at his home, we hold that he was not. The first factor calls for a consideration of the time, place, length, mood, and mode of the encounter between the defendant and the police. Based on the circumstances here, we conclude that this factor weighs against arrest. At about 7:15 a.m., Harris and Balsitis knocked on the door of defendant's home, and his mother answered. The detectives explained that they were investigating a fire that occurred at a party that defendant attended, and they asked to speak with defendant. Defendant's mother awakened defendant, and he conversed with the detectives. As he was doing so, Malatia and Evoy arrived. Within about 15 minutes, defendant agreed to accompany the police to the department to answer questions. Defendant asked to grab some items and to use the bathroom, and the police agreed to this request. As defendant went into his basement bedroom, two detectives followed and observed as he grabbed his wallet, footwear, and keys. We note that, by following defendant unbidden, the detectives made their presence somewhat more ominous and irresistible. However, they were in plain clothes, and it is clear that their purpose was self-protection, to make sure that defendant did not grab a weapon along with the other items he said he wished to retrieve. Thus, on balance, the time, place, and length of the encounter were reasonable, and the mood was not confrontational.

¶ 65    Defendant argues that the detectives controlled his movements as soon as he agreed that he would accompany them to the police department. Defendant contends that the detectives barged into the house uninvited, shadowed him into the basement, and demanded that he leave open the bathroom door as he used it. The evidence adduced at the hearing does not support this contention. Defendant points to descriptions used, such as, "the police allowed," or "the police permitted." An examination of the relevant testimony, however, shows that Malatia responded to a question that used "permitted." (We later address his use of "allowed.") Moreover, in granting defendant's requests, the police were accommodating defendant's wishes rather than demonstrating that he had no choice but to accede to their demands. Finally, as to the open bathroom door, Harris stated that he did not tell defendant to leave it open and was in fact unsure as to whether defendant left it open or closed. We therefore disagree with

defendant's contentions in this regard and conclude that the first factor weighs against an arrest occurring at the house.

¶ 66  The second factor, the number of police officers present, also weighs against an arrest at the house. First, two detectives approached defendant's house and asked to speak with defendant. When defendant was informed of the police presence, he went to the porch to speak with them. Two more detectives arrived as defendant was speaking to the original two, so defendant was confronted by a total of four. This number is in line with the number in *Gomez*, in which four officers approached the defendant at his house and asked the defendant to accompany them. *Id.* ¶ 60. When defendant asked to grab his things, he was accompanied by one of the detectives, with another nearby. The remaining two do not appear to have been in defendant's presence at that time. Finally, when defendant agreed to accompany the detectives, he got into an unmarked police car with two of them. Thus, although there were four detectives present, it appears that defendant closely interacted with only two at most times. Based on this, we conclude that the second factor weighs against an arrest occurring at defendant's house.

¶ 67  Defendant argues that this case is like *People v. Ocampo*, 377 Ill. App. 3d 150, 157-60 (2007). Defendant contends that *Ocampo* held that the presence of three police officers, who stated that they "needed to talk" to the defendant, created an environment in which a reasonable person would believe that he or she was in custody. *Ocampo*, however, involved a seizure made by an officer who displayed his badge and stated that he needed to talk with the defendant. *Id.* at 153. Here, by contrast, the police asked if defendant was willing to accompany them to the police department to answer questions, and defendant agreed. This act of agreement serves to distinguish *Ocampo*. See *Gomez*, 2011 IL App (1st) 092185, ¶ 58 (a defendant's voluntary agreement to accompany police means that he or she was not arrested).

¶ 68  The third factor, indicia of formal arrest or restraint, weighs strongly against an arrest at defendant's home. First, there is no evidence in the record, and there is no argument by defendant, that the police displayed their weapons, made physical contact with defendant, or restrained defendant in any way, such as by using handcuffs or physically grabbing defendant. Instead, the record shows that the police acquiesced to defendant's requests to collect his belongings and to use the bathroom. Thereafter, defendant agreed to accompany the detectives to the police department, and he walked to the indicated vehicle and entered it on his own with no assistance from the detectives. Moreover, there is no indication that defendant was searched before he entered the vehicle. Additionally, the vehicle defendant entered was not a marked police vehicle, and the detectives were not in police uniforms. Therefore, this factor weighs strongly against an arrest occurring at the home.

¶ 69  The fourth factor, the officers' intention, is neutral with regard to an arrest at defendant's home. The detectives had identified defendant as a person of interest in the arson, stemming from their interviews of the partygoers. They had learned that defendant was upset, had a significant and alarming argument with Morgan, and made some sort of threat to the partygoers and possibly to Morgan a couple of hours before the fire. Thus, when they approached defendant, the detectives reasonably believed that he might have information about the fire. Nevertheless, the detectives simply asked defendant if he was willing to accompany them to the police department to answer questions. We conclude that the detectives' intention when they approached him at his home was still to gather information rather than to effect an arrest. However, their focus on defendant tends to counterbalance the

information-gathering purpose to some extent. Therefore, we conclude that this factor is neutral.

¶ 70    The fifth factor, the defendant's subjective belief, weighs strongly against an arrest at defendant's home. Defendant agreed to accompany the detectives to the police department and to answer their questions. " 'When one voluntarily accompanies police officers, he has not been arrested and has not been "seized" in the fourth amendment sense.' " *Id.* ¶ 58 (quoting *People v. Redmond*, 341 Ill. App. 3d 498, 507 (2003)). In agreeing to accompany the detectives, defendant could not have believed that he was arrested. This factor overwhelmingly weighs against an arrest at defendant's home.

¶ 71    The sixth factor, whether the defendant was informed that he could refuse to accompany the police, also weighs against an arrest at the house. Implicit within defendant's agreement to accompany the detectives is the knowledge that he could also refuse to accompany them. Accordingly, this factor weighs against an arrest.

¶ 72    The seventh factor, whether the defendant was transported in a police car, weighs slightly against an arrest. It is clear that the police transported defendant in an official car. The car, however, was unmarked, and the record is unclear whether the rear seat was caged or otherwise unusual. Further, defendant himself entered the car without any of the detectives placing him there; the record shows that defendant went to the rear of the car, opened the door, and entered the rear seat. Additionally, and more importantly, defendant's agreement to accompany the police significantly mitigates the effect of being transported in a police car. Therefore, we conclude that this factor at least slightly weighs against an arrest occurring at the home.

¶ 73    Defendant cites *People v. Vega*, 203 Ill. App. 3d 33, 41-42 (1990), for the proposition that whether the defendant was given the choice of making his own arrangements to go to the police department must be considered. We note, however, that in this case defendant made the decision to accompany the police to the department; in *Vega*, by contrast, the defendant had avoided police attempts to contact him, and when the police finally encountered him, he was not given the opportunity to refuse to come with them. *Id.* at 41. Here, in his initial contact with the police, defendant was asked if he was willing to come with them to the department, and he agreed to do so. See *Gomez*, 2011 IL App (1st) 092185, ¶ 58. *Vega*, therefore, is distinguishable.

¶ 74    The eighth factor weighs against an arrest. This factor considers whether the police told the defendant that he was free to leave. Defendant's agreement to accompany the detectives implicitly recognized the fact that defendant could have refused to go, which implies that he was free to leave the encounter. Thus, the eighth factor weighs against an arrest occurring at defendant's home.

¶ 75    The ninth factor, whether the defendant was informed that he was under arrest, strongly weighs against an arrest. The record affirmatively demonstrates that, at the house, the detectives never stated that defendant was under arrest. Rather, they asked defendant if he was willing to accompany them to the department and answer questions. Defendant's agreement to do so indicates that he had a choice. Accordingly, this factor strongly weighs against an arrest occurring at the house.

¶ 76    The tenth and final factor, the language the police used, also weighs against an arrest at defendant's home. The police asked defendant if he was willing to accompany them and to answer questions at the police department. This is a far cry from any imperative or peremptory language requiring defendant to come with them. Defendant argues, however, that the police

- 14 -

*permitted* him to retrieve certain personal items. "Permitted," however, is simply the word used by the prosecutor in the State's examination of Malatia, not language volunteered by Malatia to explain what occurred at defendant's home. The impact of the word "permitted" is therefore significantly less than defendant suggests. Defendant also argues that the police *allowed* him to use the bathroom. This time, "allowed" was the word Malatia actually used in describing his response to defendant's statement that he needed to use the bathroom. Even so, we do not believe that Malatia's use of the word implies that the police were restricting defendant in any fashion. Quite the opposite: had the police *refused* defendant's request to use the bathroom, *then* they would have been restricting defendant and overtly coercing him by placing him in discomfort and exercising their power over him. Instead, the detectives' agreement to let defendant use the bathroom suggests accommodation and concern for defendant's physical necessities, and it demonstrates their desire to make defendant physically comfortable. Thus, the use of the words "permitted" and "allowed" does not have the coercive connotations defendant claims. Moreover, the words were used in summarizing what occurred and not as the language used in actually speaking with defendant. Thus, we conclude that there was nothing in the language used by the detectives that suggested that defendant had no choice but to accompany them to the police department. This factor weighs against an arrest occurring at the home.

¶ 77    Based on our consideration of the factors, we conclude that defendant was not arrested at his home. We next turn to whether defendant was arrested upon his arrival at the police department.

¶ 78    Defendant's alternative contention is that he was arrested at about 7:37 a.m., when he arrived at the police department and was placed into the interview room. For this analysis, we will also consider whether defendant was arrested at any time during the initial questioning, before defendant began answering any substantive questions about his actions during the day and evening of Morgan's party.

¶ 79    The first factor, the time, place, length, mood, and mode of the encounter, again weighs against an arrest. Defendant agreed to accompany the detectives to the police department. The time in transport was relatively brief. Likewise, the time spent in the preliminary questioning was also relatively brief. This encounter occurred in an interview room at the police department, but Malatia and Evoy were not confrontational and were professional and business-like. The mood appeared to be fairly relaxed. We conclude, then, that the first factor weighs against an arrest.

¶ 80    The second factor, the number of police officers present, also again weighs against an arrest. When he arrived at the department, defendant was accompanied by Malatia and Evoy, and these detectives conducted the initial encounters there. Although there was a large number of officers at the department, defendant does not appear to have interacted with them, only with Malatia and Evoy. Thus, we conclude that this factor again weighs against an arrest.

¶ 81    The third factor, indicia of formal arrest, weighs strongly in favor of an arrest. When defendant arrived at the police department, he was taken to the interview room, and Malatia patted him down and removed his wallet and phone, placing them in a cubby outside of the interview room. Malatia explained that the pat-down was to make sure that defendant was not armed, and Malatia also removed his own weapon so that no one in the interview room would be armed. In spite of this explanation, the pat-down and confiscation of defendant's wallet and phone were clear indicia of an arrest. In addition, Malatia Mirandized defendant, which is

another clear indication of an arrest. Malatia attempted to soften the clear import of Mirandizing defendant by explaining that it was standard procedure to read *Miranda* rights to every person the police interviewed. Nevertheless, on these facts, we conclude that this constitutes a clear indication that defendant was being arrested. On the other hand, Malatia did not subject defendant to formal booking procedures or otherwise physically restrain defendant.

¶ 82    During this initial portion of the questioning, Malatia presented the *Miranda* warnings to defendant, and defendant inquired whether he needed a lawyer. Malatia responded that it was up to defendant to decide. Defendant then asked whether, if he decided to request an attorney, he would still have to wait in the interview room. Malatia responded, "Yeah, obviously." Defendant argues that Malatia's response clearly indicated that he was arrested at that time. We note, however, that Malatia then followed up his response by asking defendant if he wanted to speak with the police. Defendant reiterated that he was still willing to speak with them. Nevertheless, this factor strongly weighs in favor of an arrest at the beginning the questioning.

¶ 83    The fourth factor again is neutral. The detectives' intention remained investigative and not accusative. Defendant was being questioned about the fire, but other partygoers had also been and were being questioned. The police had begun focusing on defendant, but they had not determined to arrest defendant at this point. Thus this factor again is neutral.

¶ 84    The fifth factor, the defendant's subjective belief, again strongly weighs against an arrest. Defendant had agreed to accompany the detectives to the police department and to undergo questioning there. During the initial questioning, defendant stated that he did not have to be there or to answer questions, which indicates that defendant did not believe that he had yet been arrested. Thus this factor weighs strongly against an arrest.

¶ 85    The next two factors do not apply. The sixth factor, whether the defendant was informed that he or she could refuse to accompany the police, applies to transporting the defendant to the police department, not to this phase of an encounter. Even if it applied, defendant agreed to accompany the police. The seventh factor is the mode of transport, which also does not apply to this phase of the encounter. Again, even if it applied, defendant agreed to be transported in the police vehicle. Thus, if they applied, these factors would weigh against an arrest.

¶ 86    The eighth factor, whether the defendant was informed that he was free to leave, weighs in favor of an arrest. As noted above, at the outset of the questioning, when defendant asked whether he needed an attorney, Malatia told him that he needed to decide that for himself. Defendant asked whether, if he decided to request an attorney, he would need to remain in the interview room. Malatia replied, "Yeah, obviously." Thus, not only was defendant not informed that he was free to leave, he was informed that he was, in fact, *not* free to leave. This factor strongly weighs in favor of an arrest.

¶ 87    The ninth factor, whether the defendant was informed that he was under arrest, again weighs against an arrest. There is nothing in the record indicating that any police officer told defendant that he was under arrest.

¶ 88    The final factor, the language used by the police, weighs in favor of an arrest. As noted, Malatia essentially told defendant that he was not free to leave. Thus, he conveyed to defendant that defendant had no choice about remaining in the police department and answering questions. This factor weighs in favor of an arrest.

¶ 89    The fact that we are to consider 10 factors does not mean that each factor will be given equal weight in all circumstances. In other words, we cannot simply count those factors weighing in favor of arrest and those weighing against arrest and see which is greater. Here, the most significant factors are defendant's treatment upon arriving at the police department, when he was patted down and his possessions were removed from him, and Malatia's statement that defendant would have to remain in the interview room if he invoked his right to counsel. In our view, these factors are sufficient to tip our calculus to the conclusion that, by around 7:45 a.m., defendant had been arrested. Accordingly, we hold that the trial court's determination that defendant was not arrested until 8:44 a.m. was in error. We now turn to the question of whether there was probable cause to arrest at approximately 7:45 a.m.

¶ 90    Probable cause to arrest exists when the facts known to the police officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the defendant has committed a crime. *People v. Wear*, 229 Ill. 2d 545, 563 (2008). In determining the existence of probable cause, we consider the totality of the circumstances at the time of the arrest. *Id.* at 564. Probable cause is not a technical concept; rather, it is a factual and practical concept, dealing with the considerations of everyday life on which a reasonable and prudent person acts. *Id.* Probable cause does not require proof beyond a reasonable doubt; rather it is the probability of criminal activity, and probable cause can exist even though the evidence does not even support a belief that it is more likely than not that the defendant committed a crime. *Id.* With these principles in mind, we consider what the police had learned by about 7:45 a.m., which excludes defendant's statements from that time until about 8:44 a.m.

¶ 91    The record shows that, before defendant was contacted at his house, the police investigation had determined that the fire that partially consumed the Morgan home had started in Morgan's car, parked near the garage. The fire department believed that the fire was the result of arson, having found ashes in the car's gasoline fill tube. Before the fire started, defendant had attended a party at Morgan's house. Defendant and Morgan had dated, but they either had broken up or were in the process of breaking up. During the party, defendant became extremely upset and engaged in a heated argument with Morgan, ostensibly over a necklace he had given her. The argument was so heated that partygoers restrained defendant and calmed him down before Schopa drove him away from the party. There was evidence suggesting that the argument between defendant and Morgan turned physical, with defendant pushing Morgan and grabbing her. Defendant called Morgan names while he was demanding the return of the necklace. At some point, defendant stated to the partygoers that he hoped they would all die. There was a suggestion that Morgan had been within earshot of this threat, but it was not entirely clear whether she had heard the threat. After defendant had been driven away and before the fire started, several partygoers observed someone in the shadows near Morgan's home. They were unable to identify the shadowy figure, but they all believed it to be defendant. Additionally, one of the partygoers informed the police that defendant told him in a phone conversation that he was returning to Morgan's home. Finally, after defendant had dressed in the same clothes he wore to the party, the police observed that the clothes were visibly wet, apparently with sweat, as if defendant had engaged in significant physical exertion, such as running from Morgan's home to his home. That morning, when the police arrived at defendant's home, the temperature was about 70 degrees.

¶ 92    Before 7:45 a.m., the police further learned that Sanchez had intervened in the argument between defendant and Morgan, because Sanchez was afraid that defendant was about to strike

Morgan. Sanchez reported that he was a friend of Morgan's and that he knew that defendant and Morgan's relationship was going so badly that she no longer wanted anything to do with defendant. Additionally, also before 7:45 a.m., Melissa Czarnik, another friend of Morgan's, informed the police that defendant had tried to pull the necklace from Morgan's neck but that Czarnik got in between defendant and Morgan, trying to make defendant back off. Czarnik also confirmed that defendant was wearing a light-colored T-shirt and baggy khaki shorts at the party.

¶ 93        We conclude that the evidence that the police had in hand before 7:45 a.m. provided probable cause to arrest defendant at that time. In particular, defendant engaged in an argument with Morgan that was so heated that other partygoers were afraid it would become physical, prompting Sanchez to intervene; similarly, Czarnik placed herself in between defendant and Morgan during the argument in an attempt to cause defendant to back off. Defendant directed his statement, "I hope you all die," at the partygoers, and he might have particularly directed it at Morgan, although the record is unclear whether Morgan was present when the statement was uttered. Shortly after the statement, Morgan's car was set on fire in an act of arson. Partygoers testified that they believed that defendant had returned to the party before the fire because they saw a figure in the shadows, although no one was able to positively identify the shadowy figure. Nevertheless, this belief was corroborated by the phone call that one of the partygoers received from defendant in which defendant stated that he was returning to the party. Finally, even though it was not exceptionally warm that morning, the police observed that defendant's clothes, which matched Czarnik's description of the clothes defendant wore to the party, were visibly wet, apparently with sweat. This information was sufficient to engender a belief that there was a probability that defendant committed the arson, even though it might not have engendered a belief that it was more likely than not. See *Wear*, 229 Ill. 2d at 563-64 (probable cause need not rise to even a preponderance of the evidence; rather, the facts known at the time of the arrest need only lead a reasonably cautious person to believe that the defendant has committed a crime).

¶ 94        Defendant attempts to minimize the significance of any arguments in which he might have engaged at the party, contending that the combination of young persons and alcohol at a party often results in arguments and confrontations. This might be true in a broad sense, but it is thankfully rare that an argument occurs at a party shortly before one of the participants in the argument is seriously injured or killed. We cannot give much credence to defendant's attempted generalization in light of the facts of this particular case.

¶ 95        Defendant also argues that he cannot be tied to the scene of the fire after he had been driven away. We disagree. Again, several partygoers observed a person hanging about in the shadows near the Morgan home, and they believed that defendant had returned. Additionally, defendant told one of the partygoers with whom he was friendly that he intended to return. While this evidence is not conclusive standing alone, it does support and corroborate the partygoers' belief that defendant returned to the Morgan home after he was driven away and before the fire began, and it is sufficient to rebut defendant's contention.

¶ 96        Defendant also challenges the significance of his threat that he hoped everyone at the party would die, arguing that it was not made within Morgan's hearing. We agree that the record is not clear whether Morgan was present when the threat was made or even whether she heard defendant make it. We note, however, that the evidence of who heard the threat need not be precise because the police were attempting to determine only whether there was reason to

believe that defendant had committed a crime. The utterance of a threat shortly before an arson fire was started in Morgan's car, whether the threat was directed at her or others or whether Morgan even heard the threat, bears directly upon that determination. We reject defendant's contention.

¶ 97    Defendant challenges Mohammed's testimony that he observed a person matching defendant's description, arguing that Mohammed had also indicated that he believed the individual to be Arabic. We do not believe that this evidence could be considered in determining the existence of probable cause at 7:45 a.m., because Mohammed was interviewed between 10:30 and 11 a.m.

¶ 98    For the foregoing reasons, then, we hold that the trial court erred in determining that defendant was arrested at 8:44 a.m.; rather, the police arrested defendant by about 7:45 a.m., shortly after defendant received his *Miranda* warnings. We also hold that the police had probable cause to arrest defendant by about 7:45 a.m. As a result, we affirm the trial court's judgment denying defendant's motion to quash his arrest.

¶ 99                        B. Motion to Suppress Statements: Reinitiation

¶ 100   Defendant next challenges the trial court's determination on his motion to suppress his statements. Defendant contends that the trial court erred in concluding that he reinitiated the discussion about his case after the police had finally honored his request to speak with a lawyer and discontinued the interview.

¶ 101   As an initial matter, we note that we review the trial court's judgment on a motion to suppress with the same bifurcated standard. The trial court's findings of fact are accorded deference and will be disturbed only if they are against the manifest weight of the evidence. *People v. Miller*, 393 Ill. App. 3d 1060, 1063 (2009). We review *de novo* the ultimate question posed by the legal challenge to the trial court's ruling. *Id.* at 1064.

¶ 102   Regarding the invocation of the right to counsel, the Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436 (1966), that as a safeguard for the constitutional privilege against self-incrimination, a person subjected to custodial interrogation is entitled to have counsel present during the questioning. *Miller*, 393 Ill. App. 3d at 1064. In *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), the Supreme Court clarified that, after an accused has invoked this right, the police cannot show a valid waiver of that right simply by demonstrating only that he responded to further police-initiated custodial interrogation; an individual who has indicated that he wishes to deal with the police only through counsel is not subject to further interrogation by the police until after counsel has been made available to him, unless the accused himself initiates further discussion with the police. Police will violate this rule if they approach the accused for further questioning without first making counsel available. *Miller*, 393 Ill. App. 3d at 1064. The upshot is that any waiver of the right to counsel given in a discussion initiated by the police will be presumed to be invalid, and any statements obtained pursuant to the presumptively invalid waiver will be inadmissible in the State's case-in-chief. *Id.*

¶ 103   Analytically, when determining the admissibility of any statement procured after the defendant has invoked his right to have counsel present during a custodial interrogation, we conduct a two-part inquiry. *Id.* The first step is to determine whether the defendant or the police reinitiated discussion after the defendant invoked his right to counsel. *Id.* at 1064-65. This entails determining from whence the impetus for the additional discussion came: if from

- 19 -

the police, then *Edwards* bars the admissibility of statements made in response to the further interrogation; if from the defendant, then we proceed to the second step. *Id.* at 1065. The second step is to determine whether, in light of the totality of the circumstances, including the fact that the defendant reopened the discussion, the defendant voluntarily, knowingly, and intelligently waived his right to the presence of counsel during the further custodial interrogation. *Id.*

¶ 104　　The parties agree with the trial court's determination that, at 8:18 a.m., defendant invoked his right to have counsel present during the custodial interrogation. Additionally, the parties do not dispute that the police did not honor this invocation and continued to subject defendant to custodial interrogation until about 10:26 a.m., at which time questioning ceased, and Malatia and Evoy left defendant alone in the interview room. At about 11:26 a.m., defendant was taken outside for his second smoking break and had a conversation with Malatia. During the second smoking break, according to Malatia, defendant asked Malatia and Evoy, as many as five times, "what was going on with him and what was happening with the investigation." The detectives told defendant that they could not speak with him about the investigation because he had requested an attorney. Defendant then asked what he needed to do in order to speak with them again. Malatia told defendant that he would have to formally acknowledge that he had approached the detectives to talk about the case, that the detectives would have to readminister *Miranda* warnings, and that defendant would have to formally waive his rights again. According to Malatia, defendant agreed, they entered the interview room at about 11:36 a.m., defendant stated that he wished to speak with the detectives again, and defendant executed another form waiving his rights and a form acknowledging that he had reinitiated the discussion with the detectives.

¶ 105　　According to defendant, he asked for the second smoking break. Once outside, he asked when he could call his lawyer and go home. According to defendant, the detectives told him that he could go home only if he first decided to talk to them again. Defendant further explained that the detectives told him what to say in front of the camera. When he was returned to the interview room, he followed the script he received during the second smoking break, stating that he approached the detectives to talk about the case again and executing the forms with which he was presented. Thus, defendant concludes, the police orchestrated the events so that it was actually they and not defendant who provided the impetus for the reinitiation of the discussion about the case. According to defendant, they studiously ignored all of his invocations of his right to have counsel present and groomed defendant to expect that what he said would not matter.

¶ 106　　The trial court credited the detectives' version of events. Key to the trial court's determination was the fact that, despite defendant's claim that the detectives promised that he would be able to go home, defendant never raised the issue of that promise after he had done his part. This is borne out in the record. Accordingly, we hold that the trial court's factual determination that defendant reinitiated the discussion with Malatia and Evoy was not against the manifest weight of the evidence. See *Miller*, 393 Ill. App. 3d at 1063 (the trial court's findings of fact are accorded deference and will be disturbed only if they are against the manifest weight of the evidence).

¶ 107　　In support of his position, defendant cites *People v. Trotter*, 254 Ill. App. 3d 514, 525 (1993), for the proposition that police badgering will result in the determination that a reinitiation of discussion about the case was the product of coercion. We believe that *Trotter* is

- 20 -

distinguishable. In the first place, *Trotter* held that it was the police who had reinitiated the discussion. *Id.* at 524. Additionally, *Trotter* is factually distinguishable. In *Trotter*, after the defendant had invoked his right to counsel, an assistant State's Attorney asked the defendant if he wished to give a statement. After another 1½ hours, a police officer stated that the defendant's attorney had not shown up and he asked the defendant to make a statement. These actions of asking the defendant to speak after having invoked his right to counsel constituted badgering. *Id.* at 525. Here, by contrast, once defendant's invocation of his right to counsel was recognized, questioning ceased. After that point, no one asked defendant to make a statement before defendant reinitiated the discussion about the case. In fact, Malatia and Evoy refused to speak with defendant about the case until after defendant stated, on camera in the interview room, that he was reinitiating the questioning and had once again waived his right to counsel. Accordingly, *Trotter*, with its overt manipulation of the defendant through badgering, is distinguishable.

¶ 108    Moreover, in *Trotter*, the defendant's invocation of the right to counsel was ostensibly observed, yet the police returned to the defendant and badgered him to make a statement. Thus, *Trotter* presents a somewhat different issue than is present here, where the police did not even ostensibly observe defendant's invocation and continued the questioning as if defendant had not even tried to invoke his right to counsel. *Trotter* therefore offers no insight regarding the effect of steamrolling over a defendant's invocations of the right to counsel before finally observing one and how that might affect the voluntariness of a subsequent waiver of the right to counsel; rather, it considers the act of paying lip service to an invocation coupled with repeated attempts to question the defendant again. For this reason too, we find *Trotter* to offer little guidance in this case.

¶ 109    Defendant also cites *Dorsey v. United States*, 60 A.3d 1171, 1194 (D.C. 2013) (*en banc*), for the proposition that police misconduct, such as ignoring a defendant's invocation of his *Miranda* rights coupled with badgering, can serve to undermine the defendant's will so as to invalidate the defendant's reinitiation of the discussion. *Dorsey* recounts a particularly egregious example of police misconduct. Beginning at about 7:30 p.m., the defendant was subjected to relentless interrogation despite his unambiguous assertion of his right to remain silent, at about 11:10 p.m., and, at about 2:51 a.m. the next morning, his unambiguous invocation of his right to counsel. *Id.* at 1178-84. Despite these invocations, the police continued to question him without significant let up until about 4:45 a.m., when they left him alone in the interrogation room, handcuffed to the table. *Id.* at 1184-85. At 8:06 a.m., the questioning resumed and continued until 8:21 a.m., at which point the defendant was taken to a holding cell. *Id.* at 1185-86. About seven to eight hours later, between 3:30 and 4:30 p.m., the defendant called out to speak with the police. *Id.* at 1186. The defendant was taken to the interrogation room, was not given *Miranda* warnings, and was not asked if he would waive his rights. *Id.* at 1186-87. The defendant then proceeded to confess. *Id.* at 1187.

¶ 110    The court concluded that the defendant had not reinitiated the discussion with the police, based on his delayed response to the improper and continued interrogation that followed his invocations of his rights. *Id.* at 1194. The court held that the police conduct constituted "badgering with a vengeance," and key in its decision were the facts that the defendant had not been readvised of his *Miranda* rights after he requested to speak with the police again and that his confession mirrored the details included in the "post-invocation badgering." *Id.* at 1198. Alternatively, the court held that, even if the defendant reinitiated the discussion with the

police, he did not validly waive his rights because the police did not readvise him of his rights and obtain an express waiver. *Id.* at 1200. This, coupled with the demonstrated unwillingness to observe the defendant's invocation of his rights, meant that the prosecutor faced an uphill battle to demonstrate that the defendant knowingly, intelligently, and voluntarily waived those rights. *Id.* at 1201.

¶ 111    Our reading of *Dorsey* suggests that police misconduct by failing to honor an invocation of *Miranda* rights may render invalid a defendant's reinitiation of the discussion with police. However, we note that *Dorsey* is an extreme example of police misconduct. The police interrogation in that case never ceased after the defendant invoked his rights. After the defendant was informed of his *Miranda* rights, he was effectively interrogated for 11 hours with only brief respites; the 11-hour interrogation continued for 8 hours after his invocation of his right to remain silent and for 6 hours after his invocation of his right to counsel. A lengthy break was taken, and the defendant asked to speak with the police, but he was never again advised of his *Miranda* rights, and his confession mirrored many of the points used by the police as they continually badgered him to confess.

¶ 112    Thus, we believe that *Dorsey* is significantly distinguishable from this case. Importantly, in *Dorsey* the police never honored or observed the defendant's invocation of his rights; here, while Malatia and Evoy continued to question defendant after his 8:18 a.m. invocation of his right to counsel, at 10:26 a.m. they finally honored defendant's repeated invocation. Thus, in *Dorsey*, unlike in this case, the defendant's rights were altogether ignored. Additionally, the defendant in *Dorsey* was subjected to 12 hours of continual interrogation, about 8 of which occurred after the defendant had invoked his rights. Here, by contrast, defendant was subjected to about three hours of questioning, although over two hours occurred after the 8:18 a.m. invocation of his right to counsel. Finally, and perhaps most significantly, in *Dorsey*, the police did not readminister *Miranda* warnings to the defendant, and the defendant did not expressly waive his rights after he had asked to speak with the police. Here, by contrast, after defendant reinitiated the discussion with the police, Malatia and Evoy once again administered *Miranda* warnings, and defendant expressly waived his rights. Thus, while *Dorsey* provides helpful guidance in understanding defendant's contentions, it is nevertheless distinguishable.

¶ 113    Accordingly, we hold that the trial court's determination that defendant voluntarily reinitiated the discussion with the police was not against the manifest weight of the evidence. Because defendant reinitiated the discussion, we hold that the trial court did not err in denying defendant's motion to suppress on this point.

¶ 114                    C. Whether Defendant's Statements Were Voluntary, Knowing, and Intelligent

¶ 115    Defendant next argues that his statements following the reinitiation of the discussion with the police were not given voluntarily, knowingly, and intelligently. Instead, the detectives' refusal to pay any attention to his attempts to invoke his right to counsel caused defendant to believe that he had no choice but to answer their questions. Defendant thus argues that the statements should have been suppressed.

¶ 116    The test for voluntariness is whether the defendant made the decision freely, without compulsion or inducement, or whether the defendant's will was overborne at the relevant time. *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996). To implement this test, we consider the totality of the circumstances surrounding the statements, including the defendant's age, intelligence, education, experience, and physical condition at the relevant time; the duration of the

interrogation; the presence of *Miranda* warnings; the presence of any physical or mental abuse; and the legality and duration of the detention. *People v. Willis*, 215 Ill. 2d 517, 536 (2005). The trial court's decision regarding voluntariness presents an issue of fact, and we will not disturb it unless it was against the manifest weight of the evidence. *Id.*

¶ 117　　Defendant was 23 years old at the time of the offense. He had graduated from high school and attended some college. Defendant had not had significant experience with law enforcement. Defendant had estimated that he had 15 beers between 6 p.m. the previous evening and around 2 a.m. that morning, and at about 7:48 a.m., he asserted that he had a headache. At that time, defendant denied that he was intoxicated, but he said that he would not want to drive. However, defendant's speech was clear, and he was apparently able to comprehend and appropriately respond to the detectives' questions. He appeared otherwise alert and oriented to his situation. These factors weigh in favor of voluntariness.

¶ 118　　The duration of the interrogation had been relatively brief. By the 11:36 a.m. waiver, he had been questioned for about three hours, with a break from about 10:30 to 11:30 a.m. Defendant had been at the police department for a total of four hours when he made the 11:36 a.m. waiver. We note that significantly longer interrogations have been deemed not to render defendants' statements involuntary. For example, in *People v. House*, 141 Ill. 2d 323, 378-79 (1990), the defendant had been held in an interview room undergoing questioning for 25 hours before he made his first inculpatory statement. The court held that that amount of time was insufficient (under all of the circumstances) to render the defendant's statement involuntary. *Id.* Here, the three hours of interrogation are less than one-sixth the time in *House*. This factor weighs in favor of voluntariness.

¶ 119　　However, we note that about two hours of defendant's interrogation were conducted after defendant had invoked his right to counsel. This weighs against voluntariness. On the other hand, as mentioned above, the police eventually, albeit belatedly, honored defendant's invocation of his right to counsel, and this tends to mitigate the illegality of the interrogation. On balance, the interrogation in violation of defendant's right to counsel tips this factor slightly against voluntariness.

¶ 120　　The presence of *Miranda* warnings is a neutral factor under the circumstances of this case. At the outset, around 7:37 a.m., defendant received *Miranda* warnings. However, his invocation of his right to counsel was not immediately honored, and this tends to undercut the presence of the warnings. Nevertheless, even though the interrogation proceeded for two hours before it was stopped, the police did honor defendant's invocation of his right to counsel. When they stopped, the police advised defendant that they were doing so because he had invoked his right to counsel. After defendant reinitiated the discussions with Malatia and Evoy, he was again Mirandized. Thus, this factor is neutral.

¶ 121　　Defendant appeared to be in adequate condition. The detectives did not hit defendant or otherwise physically abuse defendant. He was allowed to use the restroom and to smoke cigarettes when he asked to do so. The questioning became intense, but the police did not subject defendant to mental abuse. Defendant had a headache and perhaps a hangover, but he was not incapacitated as a result. On balance, this factor favors voluntariness.

¶ 122　　Finally, defendant was legally detained. When he was arrested, the police had probable cause to believe that he had committed a crime. The total detention preceding the 11:36 a.m. waiver was relatively brief. This factor weighs in favor of voluntariness.

¶ 123    Based on our review of the circumstances, we conclude that defendant voluntarily gave his statements following the 11:36 a.m. waiver. Because defendant reinitiated the discussion with Malatia and Evoy and his subsequent statements were voluntarily given, we affirm the trial court's judgment on this point.

¶ 124    Defendant argues that his physical condition was poor when he made the waiver. We disagree. Although defendant stated that he had a headache at 7:48 a.m., he was able to answer questions and did not indicate that he was feeling too ill to continue answering questions. Further, in the recordings of the interrogation, he appears to be in adequate physical condition. He is not shaking, dry heaving, cradling his head, or giving any other indications that he feels unwell.

¶ 125    Defendant argues that the detectives' ignoring his attempts to invoke his right to counsel overbore his will to resist and rendered involuntary his statements after the reinitiation. While this is a concern, it was mitigated when the police stopped the questioning, telling him that they were doing so because he had asked for counsel. Thus, while continuing the interrogation after his 8:18 a.m. request for counsel arguably led defendant to expect that the police were never going to stop the questioning, the other side of the coin is that, at 10:26 a.m., the police did stop the questioning at defendant's insistence on his right to counsel, and this should have led defendant to expect that he had been and would be allowed to exercise his rights. Moreover, when defendant attempted to speak about the case during the second smoking break, Malatia and Evoy flatly refused to engage defendant, explaining that they could not talk about the case with him because he had invoked his right to counsel. This exchange should have further informed defendant that the police were serious about honoring his right to counsel, even though it might not have been enough to erase the earlier misconduct. In our view, then, the police significantly rectified their earlier misconduct. Accordingly, while a concern, the misconduct is not dispositive.

¶ 126    Defendant argues that, at 11:36 a.m., he stated, "I'll talk to you," not that he *wanted* to talk with the police again. This argument relies on a truncated exchange between defendant and Evoy. Evoy first asked defendant if he wanted to talk to him and Malatia again, and defendant responded, "Yeah." After going over some other details about what had been discussed during the second smoking break, Evoy then asked, "So now you want to talk to us," to which defendant responded, "I'll talk to you." Contrary to defendant's contention, a look at the full exchange demonstrates both his desire and his willingness to speak with Malatia and Evoy. We therefore reject defendant's contention that it evidences a belief that he had no choice.

¶ 127    Defendant argues that the police induced his statements by falsely promising him leniency and benefits if he agreed to relinquish his right to counsel and speak with them. We disagree. We discern no promises of leniency; rather, the detectives were applying psychological pressure to defendant in an unobjectionable way. Defendant also points to statements the detectives made after he had waived his *Miranda* rights. Because they came after this waiver, the purported blandishments could not have influenced defendant to waive his rights. Instead, the detectives' statements were only examples of the psychological pressure being brought to bear on defendant and were not improper inducements or threats. While promises of leniency or threats may properly be considered, we do not believe that the statements of which defendant complains rise to the level of improper inducements or threats, thereby undermining the voluntariness of defendant's statements. Instead, the detectives' statements were legitimate interrogational devices, and we reject defendant's contention.

¶ 128    Turning to whether his statements were given knowingly and intelligently, defendant argues that nothing in the record shows that he understood his rights; instead, the police would keep hammering away until defendant gave them what they demanded. When considering whether statements were made knowingly and intelligently, we consider the specific facts and circumstances, including the defendant's background, experience, and conduct. *People v. Goins*, 2013 IL App (1st) 113201, ¶ 49.

¶ 129    Defendant relies on *Dorsey*, particularly its holding that incessant police badgering left the record in that case bereft of any evidence that showed that the defendant was able to intelligently exercise his rights during the interrogation. *Dorsey*, however, is much narrower in its holding by virtue of the overwhelmingly egregious nature of the police misconduct. Properly read, the circumstances present in *Dorsey* could lead one to extract the principle defendant seeks to extract. However, under much less egregious circumstances than those in *Dorsey*, the court's reasoning loses its impetus. *Dorsey* held that the incessant badgering and refusal to honor any of the defendant's attempts to invoke his rights taught the defendant that the police would not stop questioning him until the defendant gave up whatever the police wanted. *Dorsey*, 60 A.3d at 1202. By relentlessly reinforcing this concept, the police blotted out any knowledge that the defendant might have possessed about his rights. The court concluded that nothing in the record showed that the defendant "understood [that] he would not be penalized for exercising his rights or rewarded for relinquishing them." *Id.* at 1203. *Dorsey*'s holding is, however, based on the specific and dramatic circumstances present in that case.

¶ 130    By contrast, here, defendant was initially steamrolled by the detectives' ignoring his requests to speak to his attorney, to make a phone call, and simply to be silent and not speak to them at all. However, at 10:26 a.m., the police stopped their interrogation, telling defendant that they could no longer discuss the case because he had asked to speak to his attorney. They continued to honor defendant's rights when he attempted to discuss the case during the second smoking break. Thus, unlike in *Dorsey*, the police conduct was equivocal, initially leading defendant to expect that he would be ignored but, in the end, informing him that his rights would be respected. Moreover, it did not occur during the course of more than 12 hours of interrogation followed by a further 7 or 8 hours of isolation as the defendant was left alone in a holding cell. *Id.* at 1178-87. These lapses were reinforced in *Dorsey*, because the police there did not give or readminister *Miranda* warnings to the defendant. *Id.* at 1186-87. Here, by contrast, defendant received *Miranda* warnings at the outset of the interrogation, and they were readministered when defendant reinitiated the discussion with the police. Based on this record, we cannot conclude that *Dorsey*, with its extreme and egregious police misconduct, applies. We do not minimize the police misconduct that occurred here, but it simply rose to nowhere near the level in *Dorsey*. Accordingly, we do not agree with defendant that *Dorsey* compels us to conclude that the police misconduct overbore defendant's will so as to deprive him of the opportunity to knowingly and intelligently relinquish his rights and give statements to the police.

¶ 131    In addition, we note that nothing in the record leads us to conclude that defendant was unable to or did not comprehend the rights incorporated in the *Miranda* warnings. Defendant agreed that he understood the *Miranda* warnings, and he also appeared to be aware of and comprehend the process in which he was involved.

¶ 132    Accordingly, we conclude that defendant's statements were given voluntarily, knowingly, and intelligently. As a result, we hold that the trial court did not err in denying defendant's motion to suppress his statements.

¶ 133                    D. Violation of Section 103-2.1 of the Code

¶ 134    Defendant next argues that the police violated section 103-2.1 of the Code (725 ILCS 5/103-2.1 (West 2012)), which requires that all interrogations in a murder case be recorded. Specifically, defendant accuses Malatia and Evoy of taking defendant to a video blind spot for his smoking breaks and continuing the questioning. Defendant urges us to suppress his statements made during or after the breaks as a result of the violation.

¶ 135    Section 103-2.1 provides, pertinently:

> "(b) An oral, written, or sign language statement of an accused made as a result of a custodial interrogation at a police station or other place of detention shall be presumed to be inadmissible as evidence against the accused in any criminal proceeding brought under[, among others, section 9-1 of the Criminal Code of 2012 (720 ILCS 5/9-1 (West 2012))] unless:
>
> > (1) an electronic recording is made of the custodial interrogation; and
> >
> > (2) the recording is substantially accurate and not intentionally altered.
> >
> > ***
>
> (d) If the court finds, by a preponderance of the evidence, that the defendant was subjected to a custodial interrogation in violation of this Section, then any statements made by the defendant during or following that non-recorded custodial interrogation, even if otherwise in compliance with this Section, are presumed to be inadmissible in any criminal proceeding against the defendant except for purposes of impeachment.
>
> (e) Nothing in this Section precludes the admission *** (ii) of a statement made during a custodial interrogation that was not recorded as required by this Section, because electronic recording was not feasible ***. The State shall bear the burden of proving, by a preponderance of the evidence, that one of the exceptions described in this subsection (e) is applicable. Nothing in this Section precludes the admission of a statement, otherwise inadmissible under this Section, that is used only for impeachment and not as substantive evidence.
>
> (f) The presumption of inadmissibility of a statement made by a suspect at a custodial interrogation at a police station or other place of detention may be overcome by a preponderance of the evidence that the statement was voluntarily given and is reliable, based on the totality of the circumstances." *Id.*

¶ 136    Defendant argues that, because the first four smoking breaks constituted custodial interrogation during a murder investigation (which triggers the recording requirement of section 103-2.1) and were unrecorded, all of his statements made during or after those smoking breaks must be suppressed by operation of section 103-2.1. We disagree.

¶ 137    As an initial matter, defendant has forfeited our review of this issue. In order to preserve an issue for review, a defendant must make a timely objection at trial and raise the issue in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). While defendant included this issue in his posttrial motion, he did not raise it before trial as part of his motion to suppress or at trial. Consequently, the issue is forfeited.

¶ 138    Defendant argues that we may nevertheless consider the issue pursuant to the doctrine of plain error. The plain-error doctrine allows a court to review an otherwise forfeited error under two circumstances: (1) a clear and obvious error occurred and the evidence was closely balanced such that the error might have tipped the scales of justice against the defendant or (2) regardless of the closeness of the evidence, a clear and obvious error occurred that was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. *People v. Sandifer*, 2016 IL App (1st) 133397, ¶ 17. The defendant bears the burden of persuasion in establishing the existence of plain error. *Id.* The first step of a plain-error analysis is to determine whether error occurred; without error, there cannot be plain error. *Id.*

¶ 139    Defendant argues that each of the first four smoking breaks occurred in a blind spot, not covered by the video surveillance system monitoring the area outside of and surrounding the police department. According to defendant, because none of the first four smoking breaks were electronically recorded as required by section 103-2.1, all statements made during or after any of the first four smoking breaks are presumptively inadmissible. Defendant contends that the State failed to demonstrate by a preponderance of the evidence that any of the statements given during or after the smoking breaks were voluntary and reliable.

¶ 140    As an initial matter, defendant overlooks that, by its very terms, section 103-2.1 applies only to "custodial interrogation." 725 ILCS 5/103-2.1 (West 2012). Defendant presupposes that the smoking breaks constituted custodial interrogation that was required to be electronically recorded. However, the trial court determined, as a matter of fact, that the second smoking break did not involve any questioning by Malatia or Evoy. Based on our review of the record, we cannot say that this factual determination was against the manifest weight of the evidence. *Gomez*, 2011 IL App (1st) 092185, ¶ 54. This factual determination suggests that section 103-2.1 would simply not apply to the second smoking break. Indeed, the trial court accepted the police witnesses' versions of all of the smoking breaks (and we cannot say that these determinations were against the manifest weight of the evidence), and these factual findings would seem to remove the breaks from the ambit of section 103-2.1. Defendant does not address the effect of these factual findings with respect to the second smoking break (or any of the smoking breaks, for that matter) on our analysis under section 103-2.1. For this reason, then, defendant's argument fails almost by definition.

¶ 141    Notwithstanding the issue of whether section 103-2.1 even applies in light of the trial court's factual findings, we address defendant's argument. First and foremost, defendant's argument is logically flawed. Defendant complains only about the first four smoking breaks being unrecorded, but we note that the fifth smoking break was recorded and that the recording consists only of visual images. The record thus shows that the outside surveillance system was unable to capture any sound. Thus, even had the first four smoking breaks occurred in a location that was under the eye of the outside surveillance system, the only thing the outside surveillance system could have shown was that the detectives were not physically abusing defendant (and even this could be questioned, because hypothetically the detectives could have carried out some physical abuse that did not involve any overt gestures, such as bending or breaking a finger under the guise of guiding defendant along while holding defendant's hand behind his back).[1] Without audio, there would be no way to determine, apart from the

---

[1]We emphatically note that defendant does not allege that any physical abuse occurred during the smoking breaks.

testimony of defendant and the detectives, what had been said and whether it was improper. The recording would have been worthless to prove or disprove defendant's contentions.

¶ 142 Second, defendant essentially makes a whipsaw argument. The smoking breaks were unrecorded, so the police should not have taken him outside where the smoking breaks could not be recorded. However, had the police kept him inside, defendant would complain that he was coerced because the police would not let him smoke and he was suffering so badly from nicotine withdrawal that he would have said anything to be able to smoke a cigarette. Thus, under defendant's argument, the police were damned if they did and damned if they did not. This, then, is a fundamentally unfair argument.

¶ 143 Finally, we have concluded that defendant's statements following the second smoking break were made voluntarily pursuant to a knowing and intelligent waiver of his right to counsel. Accordingly, we hold that the State overcame the presumption of inadmissibility by demonstrating, by at least a preponderance of the evidence, that the complained-of statements were given voluntarily and were reliable. 725 ILCS 5/103-2.1(f) (West 2012).

¶ 144 Additionally, we believe that the State has also demonstrated that the electronic recording of the smoking breaks was not feasible. 725 ILCS 5/103-2.1(e)(ii) (West 2012). As noted, even had the first four smoking breaks been recorded by the outside surveillance system, they would have been silent and therefore useless to show what had been said during them. The court would have been required, as actually occurred, to resolve what occurred during the smoking breaks through the testimony of the participants. We conclude that the State successfully demonstrated that a recording of the smoking breaks would not have been feasible. *Id.*

¶ 145 Defendant cites *People v. Harris*, 2012 IL App (1st) 100678, for the proposition that a statement given in violation of section 103-2.1 must be suppressed. We find *Harris* to be distinguishable. In that case, the court held that the defendant's statement was not voluntary. *Id.* ¶ 64. Here, we have concluded that defendant's statements were voluntary. Accordingly, *Harris* is distinguishable.

¶ 146 Defendant also cites *People v. Richardson*, 2015 IL App (1st) 113075, for the same proposition. *Richardson* is also distinguishable. There, the interrogation occurred before the passage of section 103-2.1. *Id.* ¶ 164. Thus, *Richardson* offers no guidance.

¶ 147 Defendant cites *People v. Clayton*, 2014 IL App (1st) 130743, to illustrate the proper application of section 103-2.1. As in *Harris*, however, the court determined that the defendant's statements were not voluntary but were the product of the coercion inherent in custodial interrogation. *Id.* ¶ 45. Here, defendant's statements were voluntary, and this serves to distinguish *Clayton*.

¶ 148 Defendant has failed to show the existence of error under section 103-2.1. He therefore cannot show the existence of plain error. Accordingly, we must honor defendant's forfeiture of this issue.

¶ 149                               E. Refusal of Defendant's Jury Instruction

¶ 150 Defendant last contends that the trial court erroneously refused his proposed jury instruction on the foreseeability of the events that led to Morgan's death. Specifically, defendant offered IPI Criminal 4th No. 7.15A (Supp. 2011) in the following form:

> "A person commits the offense of first degree murder when he commits the offense of aggravated arson or arson, and the death of an individual results as a direct and

foreseeable consequence of a chain of events set into motion by his commission of the offense of aggravated arson or arson.

It is immaterial whether the killing is intentional or accidental."

Defendant argues that the manner of Morgan's death was not foreseeable; rather, it was a combination of unforeseeable circumstances that resulted in her home becoming engulfed in flames. In particular, defendant notes that he did not use an accelerant to light Morgan's car on fire, so it would have been extremely unlikely to involve the house in the fire. According to defendant, the house caught fire only because the garage door had been left open, the door to the mudroom had been left open, and a powerful all-house fan in the attic drew the smoke and flames from the car into the house. Defendant argues that nothing in the jury instructions conveyed to the jury the requirement that, in order for him to be found guilty, Morgan's death had to be a foreseeable consequence of defendant's actions.

¶ 151 The purpose of jury instructions is to provide the jury with the correct legal principles to apply to the evidence in order to reach a proper conclusion based on the applicable law and the evidence presented. *People v. Parker*, 223 Ill. 2d 494, 500 (2006). We must determine whether the instructions fairly, fully, and comprehensively informed the jury of the relevant legal principles. *Id.* at 501. We must construe the jury instructions as a whole rather than reading them in isolation. *Id.* Where the issue presented is whether the jury instructions accurately conveyed to the jury the applicable law, our review is *de novo. Id.*

¶ 152 Here, the trial court refused defendant's proffer of IPI Criminal 4th No. 7.15A (Supp. 2011) and instructed the jury according to Illinois Pattern Jury Instructions, Criminal, Nos. 7.01, 7.02 (4th ed. 2000) (hereinafter, IPI Criminal 4th Nos. 7.01, 7.02). The instruction based on IPI Criminal 4th No. 7.01 stated: "A person commits the offense of first degree murder when he kills an individual if, in performing the acts which cause the death, he is committing the offense of Aggravated Arson or Arson." The instruction based on IPI Criminal 4th No. 7.02 provided:

"To sustain the charge of first degree murder, the State must prove the following propositions:

*First Proposition*: That the defendant performed the acts which caused the death of Paula Morgan; and

*Second Proposition*: That when the defendant did so, he was committing the offense of Aggravated Arson or Arson.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

Defendant contends that these jury instructions were not accurate because they did not address whether it was foreseeable that a fire started in Morgan's car would spread to the occupied house.

¶ 153 In Illinois, where a death is caused by a third party, the felony-murder rule follows the proximate-cause theory, meaning that liability for murder will attach for any death proximately resulting from the unlawful activity, even if the death is caused by one resisting the crime.

*People v. Lowery*, 178 Ill. 2d 462, 465 (1997). The proximate-cause theory of liability is the minority rule; the agency theory of liability is the majority rule. *Id.* at 466. Under the agency theory, liability for a felony murder does not extend to a killing, although growing out of the commission of the felony, if it is directly attributable to the act of one other than the defendant or those associated with the defendant in the unlawful enterprise. *Id.*

¶ 154          However, it is also true that felony murder is based on strict liability. *People v. Causey*, 341 Ill. App. 3d 759, 769 (2003). The State is not required to prove that the defendant could foresee the death or that the defendant intended to commit murder; the State need show only that the defendant intended to commit the underlying felony. *Id.*

¶ 155          At first blush, it would appear that the proximate-cause theory contradicts the statement that felony murder is based on strict liability. However, a closer examination of *Lowery* demonstrates that the proximate-cause theory (as well as the agency theory) is invoked when the death was caused by a third party. In *Lowery*, the defendant was liable for felony murder because the intended victim obtained the defendant's gun and shot at the defendant, striking a passerby. *Lowery*, 178 Ill. 2d at 464. The proximate-cause theory works to attribute the death to the defendant if that death was foreseeable. *Id.* at 467. The defendant's act of attempting to rob the victim at gunpoint set in motion the sequence of events that resulted when the victim obtained the gun from the defendant and fired, and this result was foreseeable. *Id.* at 470.

¶ 156          In contrast, the defendant in *Causey* participated in a beating and robbery of the victim, who died as a result of the beating. *Causey*, 341 Ill. App. 3d at 765. The court expressly held that, in a felony murder, the State was not required to prove that the death of the victim was foreseeable where the death was caused by the defendant or a codefendant for whom the defendant was responsible. *Id.* at 769-70. This makes sense. If the death is caused by one outside of the criminal actors, then it would be unjust to impose liability if the mechanism of death was so remote as to be unforeseeable; whereas it remains just to impose liability for an act directly committed by the defendant that caused the death of the victim, even if the precise mechanism of death was not envisioned by the defendant as he was committing the underlying crime.

¶ 157          Accordingly, the foreseeability qualification embodied in IPI Criminal 4th No. 7.15A (Supp. 2011) has been required only in cases in which a third party outside of the criminal actors caused the death. See *People v. Hudson*, 222 Ill. 2d 392, 406 (2006) (cofelon killed by off-duty police officer; jury instructed on reasonable foreseeability); *People v. Klebanowski*, 221 Ill. 2d 538, 555 (2006) (cofelon being killed by off-duty police officer was foreseeable consequence of the defendant's acts); *People v. Nash*, 2012 IL App (1st) 093233, ¶¶ 25-28 (IPI Criminal 4th No. 7.15A (Supp. 2011) was properly delivered to the jury where the cofelon had been shot by a police officer). Defendant cites no case in which IPI Criminal 4th No. 7.15A (Supp. 2011) was delivered to the jury where the death was caused by the defendant; likewise, our research has found no such case.

¶ 158          We also note that the comments to IPI Criminal 4th No. 7.15A (Supp. 2011) suggest that it is to be given in situations "where the defendant did not perform the acts which caused the death of the deceased." IPI Criminal 4th No. 7.15A (Supp. 2011), Committee Comments. Based on the fact that the comments suggest that IPI Criminal 4th No. 7.15A (Supp. 2011) does not apply to a situation in which the defendant is alleged to have committed the act that resulted in the death of the deceased, and the fact that the only cases we have been able to find in which IPI Criminal 4th No. 7.15A (Supp. 2011) has been used are those in which the

defendant did not perform the act that caused the death of the deceased, we hold that the trial court did not err in refusing defendant's proposed jury instruction.

¶ 159    Defendant maintains that the spread of the fire from the car to the house was unforeseeable, so that the singular fact that he set Morgan's car afire cannot subject him to criminal liability for her death under the felony-murder rule. We disagree. Defendant's argument incorrectly presupposes that the proximate-cause theory and its reliance on foreseeability should apply even though it was defendant and not a third party who committed the act. Even if it applied to defendant as the actor in this case, we note that fire spreads and that it is eminently foreseeable that a burning car parked in the driveway of a home might communicate the flames from the car to the house. This foreseeability is captured in the instructions that were tendered: the idea that defendant performed the act that caused the death conveys the requisite causation to satisfy the proximate-cause theory of felony murder in this case. As noted, in a case such as this, the defendant's ability to foresee the exact mechanism of death is immaterial so long as his actions caused that death. *Causey*, 341 Ill. App. 3d at 769-70. Accordingly, we reject defendant's argument.

¶ 160                              III. CONCLUSION

¶ 161    For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed. As part of our judgment, we grant the State's request that defendant be assessed the State's Attorney fee of $50 pursuant to section 4-2002(a) of the Counties Code (55 ILCS 5/4-2002(a) (West 2014)) for the cost of this appeal. See *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 162    Affirmed.