2020 IL App (1st) 172627-U

SIXTH DIVISION
September 30, 2020

No. 1-17-2627

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 03080 (02) |
| | ) | |
| EDGARDO COLON, | ) | Honorable |
| | ) | Erica L. Reddick, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**O R D E R**

¶ 1     *Held*: Where defendant made two unequivocal requests for counsel during his interrogation and the police never honored either request, the trial court's partial denial of defendant's motion to suppress was erroneous; because that error was not harmless, we reverse and remand the case for a new trial.

¶ 2     A jury found defendant Edgardo Colon guilty of first degree murder, armed robbery, and

aggravated battery with a firearm, and the trial court sentenced him to a total of 84 years in prison.

On appeal, Mr. Colon argues that the trial court erred when it denied his motion to suppress certain

statements he made to the police during a 50-plus-hour interrogation because (1) he twice invoked his right to counsel during the interrogation, but was ignored, and (2) he never reinitiated discussions with the detectives because they never honored the invocation of his right to counsel by terminating the interrogation. For the following reasons, we reverse and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4      Mr. Colon was charged, along with Tyrone Clay who is not party to this appeal, with first degree murder, armed robbery, and aggravated battery in connection with the December 29, 2011, shooting death of off-duty Chicago police officer Clifton Lewis. Mr. Colon was arrested on January 3, 2012, for an unrelated gun possession offense, and while he was being transported to the police station, he told the arresting officers that he had information about Officer Lewis's shooting. He was then interrogated by detectives for over 50 hours, during which he made several statements implicating himself as the driver of the car used to travel to and from the scene of the crime.

¶ 5                                A. The Motion to Suppress

¶ 6      Mr. Colon filed his motion to suppress on March 24, 2015, arguing that his statements to the police were involuntary because they were obtained as the result of (1) an interrogation that continued after Mr. Colon asked for an attorney and (2) psychological and mental coercion from being kept in police custody for more than two days. The hearing on Mr. Colon's motion began on July 15, 2015. Mr. Colon is no longer arguing that his statement was coerced, so we will focus on the parts of the hearing and of the electronically recorded interview (ERI) that are relevant to the issues on this appeal.

¶ 7      Sergeant Albert Perez, who was a detective in January 2012, testified that he and his partner, Detective John Hillman, spoke to Mr. Colon starting at 8:15 p.m. on January 3, 2012.

Sergeant Perez testified that he advised Mr. Colon of his rights before questioning him, and Mr. Colon indicated he understood. That conversation was not video recorded because the sergeant considered Mr. Colon to be a third-party witness with respect to Officer Lewis's murder, rather than a suspect. Sergeant Perez testified that Mr. Colon initially told him that "Breed" (Tyrone Clay) had shared with Mr. Colon that he and "Tarzan" (Melvin DeYoung) had gone into a store to rob it with a gun provided by "Flip" (Alexander Villa). Mr. Colon also said that Mr. DeYoung was the driver. Based on the nicknames, Sergeant Perez discovered that all three men Mr. Colon named were in the same gang as Mr. Colon: the Spanish Cobras.

¶ 8    Shortly after 9:30 a.m. on January 4, Mr. Colon voluntarily took a polygraph examination. When Sergeant Perez and Detective Hillman interviewed Mr. Colon again at 11 a.m. that day, Mr. Colon's story changed: he said he learned from Mr. Villa, when he was at Mr. Villa's house with his girlfriend on December 30, 2011, that it was Mr. Villa and Mr. Clay who entered the store and shot the officer, while Mr. DeYoung was the driver. Mr. Colon said that he had lied because Mr. Villa was a high-ranking member of the gang and Mr. Colon was afraid of retaliation.

¶ 9    Sergeant Perez testified that he and Detective Hillman interviewed Mr. Colon's girlfriend later on January 4. Then, in the morning of January 5, 2012, Mr. Villa, Mr. Clay, and Mr. DeYoung were arrested and brought to the station. Because Sergeant Perez had been working since January 3, he left the station at 6 or 7 a.m. on January 5. Sergeant Perez returned to the station at approximately 3:30 p.m. that same day. He learned that, while he was gone, Mr. Colon had been taken to a detention hearing before a judge in reference to the gun possession charge, then brought back to the station and moved to a lineup room. Mr. Colon still had not implicated himself in connection with the shooting of Officer Lewis, nor had anyone else.

¶ 10   Sergeant Perez testified that he spoke with Mr. Colon again at 9:40 p.m. on January 5

3

because Mr. Colon asked to speak with him. Mr. Colon asked Sergeant Perez for a cigarette, started smoking the cigarette he was offered, and then started crying and saying he believed he was going to jail for life. Mr. Colon then told Sergeant Perez, "man, I didn't tell you the truth." Mr. Colon then stated that he—not Mr. DeYoung—was the driver. Sergeant Perez then stopped Mr. Colon because he had implicated himself in the murder and the sergeant wanted Mr. Colon to make his statement where it could be recorded.

¶ 11    Sergeant Perez took Mr. Colon to an interview room, made sure the interview was being audio and video recorded, and read Mr. Colon his *Miranda* rights. Several clips from the ERI that followed were played at the hearing. Both those clips and the entire ERI were shared with the trial judge and are part of the record on appeal.

¶ 12    The ERI shows that Mr. Colon was brought into the interview room at 9:54 p.m. on January 5, 2012, Sergeant Perez read Mr. Colon his rights, and Mr. Colon indicated he understood. At 9:56 p.m., Mr. Colon asked, "before I start talking, how is this gonna work, if I talk?" Sergeant Perez told him he would have to talk to the state's attorney, then Detective Hillman reminded Mr. Colon that if he could not afford an attorney, one could be appointed for him, and Mr. Colon said he understood. At 9:59 p.m., after approximately forty seconds of silence, Sergeant Perez asked Mr. Colon for a second time to start at the beginning, and the following exchange occurred:

"[MR. COLON] A. Man, I'm starting to say just f*** it, get me a lawyer, man, 'cause—

[SERGEANT PEREZ] Q. Okay, listen. I will talk to the state's attorney, okay?

A. I need a guarantee, man.

Q. I cannot give you a guarantee."

¶ 13    Beginning at 10:03 p.m., Mr. Colon and Sergeant Perez had an extended conversation

about what happened the night of the shooting, during which Mr. Colon admitted that he knew Mr. Villa and Mr. Clay planned to commit a robbery and that he knew both Mr. Villa and Mr. Clay had guns. In reference to his own role, Mr. Colon stated:

> "By the fire hydrant, I dropped them off right there, I bust a U-turn, parked on the other side facing Chicago Avenue. So I couldn't tell you which way they came out of, because I'm facing Chicago Avenue, I'm facing that way. Like I told you when I heard the shots, all I heard was the shots, and, like, literally a minute later, the doors open, do-do-do, they jumped in the car. They jumped in the car, I drove off."

At some point, Detective Hillman joined the discussion. Mr. Colon and the detectives continued talking about details from the night of the shooting until 10:41 p.m., at which time the detectives left the room.

¶ 14    The detectives returned to the room at 10:57 p.m. and asked about some of the details Mr. Colon had provided, and Mr. Colon said, "I'm implicating myself because I wanna get out of here." Mr. Colon said he was a "compulsive liar" and that he had been lying: "I'm thinking that's the fastest way to get out of here, so I'm telling you, you know what I'm saying, what you wanna hear so I can get the f*** out of here." Mr. Colon then denied that he was the driver the night of the shooting and said he learned everything from Mr. Villa. Sergeant Perez told Mr. Colon he did not believe it: "You're lying now, okay? I don't think you were lying before. That was probably the most honest I've heard you yet."

¶ 15    The detectives continued to enter and exit the interview room for the next hour and when they were in the room they continued talking to Mr. Colon about the events surrounding Officer Lewis's death. At 11:45 p.m., Sergeant Perez told Mr. Colon to "[c]alm down," and asked whether he wanted a drink, something to eat, or a cigarette. Mr. Colon accepted a cigarette, then Sergeant

Perez left the room to get a working lighter. While Mr. Colon continued to talk with Detective Hillman, and while Sergeant Perez was still out of the room, the following exchange occurred at 11:46 p.m.:

"[DETECTIVE HILLMAN] Q. No listen (inaudible) that's not what this is about.

[MR. COLON] A. Is there any[]way that we can get like a public defender to come in—

Q. Hold on. Hold on—

A. —and then—

Q. —hold up. Listen. Cool it. I want you to relax. Let's have this smoke. Just kick back, relax for a few minutes, all right? Maybe, you got, you sure you don't want something to eat, it's been awhile, right? What do you want?"

Detective Hillman and Mr. Colon then spent the next minute talking about where Mr. Colon wanted a burger from.

¶ 16    At 11:47 p.m., Sergeant Perez reentered the room and Detective Hillman told Mr. Colon that he would go get Mr. Colon a burger while Mr. Colon had a smoke and relaxed. Sergeant Perez lit the cigarette for Mr. Colon, then asked Mr. Colon if he was "cool," to which Mr. Colon responded:

"[MR. COLON] A. I'm cool man, I'm just scared, man.

[SERGEANT PEREZ] Q. I know you're scared.

A. This s*** (inaudible).

Q. Okay, but listen—

A. This is what I thought about.

Q. –would you *** just tell me this much, okay, so we can continue. All right,

6

'cause I don't want to stop, okay? I want to help you out, okay? Are you gonna help me out?

A. [nodding]

Q. Okay? Tell me about what you said just like that, okay, you were driving that f***ing car, okay, o'boys did the deed, correct, yes or no?

A. Correct."

After more back and forth during which Mr. Colon again expressed his fear of going to prison for the rest of his life, to which Sergeant Perez responded, "[d]on't think like that," Sergeant Perez and Detective Hillman left the interview room to get Mr. Colon his burger at 11:48 p.m.

¶ 17    The detectives were out of the room until 11:52 p.m., when Mr. Colon knocked on the door twice and then asked to speak to his girlfriend. Sergeant Perez said she was at home and offered to get her for him, but Mr. Colon declined the offer. Then at 11:53 p.m., the following exchange happened:

"[MR. COLON] A. Man y'all, I can't go to jail, man, these n**** will kill me, man.

[SERGEANT PEREZ] Q. Why, I mean, why do you think—

A. I can't go to the county jail.

Q. —why do you think they're gonna kill you?

A. Just 'cause I'm telling on them what you think?

Q. Bro, you're at this point now where you're gonna have to let us worry about that, okay? You're gonna have to trust us, alright, with that bulls***. I told you this a hundred times, okay? So, just please, get that out of your head, okay? 'Cause you did not do the shooting, okay? You did not kill that police officer, okay? And don't you think it would help us to get somebody like you to f***ing tell the truth, okay?"

¶ 18    Sergeant Perez and Detective Hillman stayed in the room and asked about more details of the shooting, questioning Mr. Colon until approximately 12:27 a.m. on January 6. Sergeant Perez left the room at 12:29 a.m. to see if the food had arrived, and Detective Hillman and Mr. Colon continued talking in the interview room. Mr. Colon said he "felt just horrible" that he had anything to do with Officer Lewis getting killed. He said he would never think of killing someone unless they did something to his daughters and "besides that, I wouldn't hurt nobody." He explained that he just wanted the money, he was just trying to "support [his] little girl."

¶ 19    Sergeant Perez returned with the food at 12:30 a.m., then left the room again. Detective Hillman asked about a few more details about the shooting from approximately 12:31 to 12:33 a.m., and then Mr. Colon and Detective Hillman talked about Mr. Colon's family and his fears about going to prison. Detective Hillman left Mr. Colon to eat at 12:36 a.m. At 12:42 a.m., Mr. Colon knocked on the door because he was feeling nauseous, and Sergeant Perez took Mr. Colon to the bathroom.

¶ 20    At 12:46 a.m., Sergeant Perez brought Mr. Colon back to the interview room, and Mr. Colon can be heard talking upon their reentry:

> "[MR. COLON] A. I'm gonna try in a minute, I'm gonna let it calm—got a smoke please?
>
> [SERGEANT PEREZ] Q. Yes. I only got Marlboro Lights though.
>
> A. That's fine.
>
> Q. Um—Listen I want you to relax, okay? Um—I'm gonna give you a minute to f***ing chill out, eat your food, all right? And then we'll f***ing talk some more but, you know what, man, you're doing f***ing great for you, man. I'm telling you, here, f***ing take this lighter.

A. Man, Al, just all I ask is to speak to him and see if—

Q. (Inaudible) you f***ing listen to me, you f***ing volunteered, remember that."

Sergeant Perez lit a cigarette for Mr. Colon and then agreed to let Mr. Colon call his daughter later. Sergeant Perez then left Mr. Colon in the interview room again at 12:47 a.m.

¶ 21    Mr. Colon was left alone until he knocked on the door at 1:08 a.m. on January 6. Sergeant Perez reentered the room and said, "I don't want you to think that um—that I'm f***ing you or anything, okay? You know, we've been straight with each other, okay? You know your rights. Yes or no?" The following exchange then occurred:

"[SERGEANT PEREZ] [Q.] You know you have the right to remain silent?

[MR. COLON] A. Yes.

Q. You know the right that anything you say can and will be used against you in a court of law, you understand that, right—

A. Uh-huh.

Q. Yes or no?

A. Yes.

Q. You understand that if you can't afford one, one will be appointed to you, you understand that, right?

A. Uh-huh.

Q. And you understand that at any time during questioning you can ask for a lawyer, correct?

A. [nodding]

Q. And have him present, correct?

A. Yeah. That's what I kind of—

9

Q. And I'm and I've been f***ing truthful with you, correct? Right? And we've talked and you've been straight with me, right?

A. [nodding]"

¶ 22    At 1:12 a.m., Mr. Colon said, "I didn't do anything but drive a car." He also agreed that he would tell the state's attorney the same thing he told the detectives. Then this exchange occurred:

"[SERGEANT PEREZ] Q. I didn't put words in your f***ing mouth, did I?

[MR. COLON] A. No.

Q. Did I make you f***ing say anything?

A. No.

Q. You, I read you your rights twice already, because I want to make sure that you understand them, right?

A. Yeah.

Q. You understand your rights?

A. Yes, sir.

Q. Okay? Right?

A. [nodding]

Q. A hundred percent.

A. A hundred percent."

¶ 23    At 3:28 a.m., Mr. Colon was interviewed by Assistant State's Attorney (ASA) John Brassil who again administered Mr. Colon his *Miranda* rights and Mr. Colon provided a detailed explanation of his role as the driver in the robbery that resulted in Officer Lewis's death.

¶ 24    The entirety of the ERI was admitted as a part of the record, the State rested, and then the defense rested without presenting evidence. The parties presented argument on the motion the

same day, after which the judge asked for "time to consider the evidence in light of the arguments presented today, and of course in light of all the case law." The parties agreed to reconvene for a ruling the following week.

¶ 25    On December 11, 2015, the trial judge issued her ruling on the motion to suppress. She reviewed the parties' arguments and the facts of the case, noting that the facts were "largely not in dispute." The judge found first that Mr. Colon was not acting under a "sense of coercion or threat." That finding is not at issue on appeal. In reference to Mr. Colon's asserting his right to counsel, the court found that Mr. Colon's initial mentioning of counsel, which she characterized as "maybe I should get," was not an affirmative and unequivocal request for counsel. The parties agree that this is a reference to Mr. Colon's statement at 9:59 p.m. on January 5, 2012: "[m]an, I'm starting to say just f*** it, get me a lawyer, man, 'cause—."

¶ 26    However, the court found that Mr. Colon's later request for a public defender, which the parties agree was the statement that he made at 11:46 p.m. on January 5, was "an affirmative request for counsel under all of the circumstances." The judge allowed the motion to suppress with respect to all statements elicited after that 11:46 p.m. statement.

¶ 27    On January 8, 2016, the State filed a motion to reconsider and/or for clarification as to what statements were excluded, arguing that Mr. Colon twice reinitiated conversation with the detectives by expressing his willingness and desire to do so after invoking his right to counsel: first, at 11:53 p.m. on January 5 when Mr. Colon knocked on the door to his interview room asking to speak with his girlfriend, and then said "[m]an y'all, I can't go to jail, man, these n**** will kill me, man"; and second, at 12:46 a.m. on January 6, after Mr. Colon returned from being taken to the bathroom, and said, "[m]an, Al, just all I ask is to speak to him and see if—," which the State argued was Mr. Colon asking to speak to the assistant state's attorney. The State argued that

11

therefore Mr. Colon "had initiated communications that reflected a general desire to discuss the investigation twice. He had been properly advised of his *Miranda* rights and he had waived those rights."

¶ 28   The parties argued the State's motion to reconsider on January 27, 2016.

¶ 29   On February 10, 2016, the trial judge clarified her prior ruling, stating that she "previously found and still finds that when the defendant indicated is there any way he can get a public defender, *** that was an invocation of his right to counsel, that it was not equivocal, and, as such, all questioning was required to cease at that time."

¶ 30   The judge then agreed with the State that Mr. Colon reinitiated conversation at 11:53 p.m. and 12:46 a.m. and that, after those two exchanges and a repeat of the *Miranda* warnings, Mr. Colon's later statements became admissible. The court ruled as follows:

> "while the defendant did reinitate contact with the police, under the law the reinitiation has to be with respect to the charges, and this is more in the nature of being able to speak with his girlfriend. So and I also find that the detective would have needed to offer *Miranda* warnings again at this point. So I find that that is subject to suppression as well. However, in going forward—and that remains until—this is now January 6, 2012, after 1:08 a.m. The defendant and—I believe it's Detective Perez. Perez does re-mirandize the defendant, at which time the defendant, the Court finds, makes a knowing waiver *** and the Court finds that at that point those statements are not suppressed."

¶ 31   Accordingly, after ruling on the motion to reconsider, the trial judge suppressed the statements Mr. Colon made between 11:46 p.m. on January 5 and 1:08 a.m. on January 6, but permitted the rest of his statements, including those he made to the ASA beginning at 3:28 a.m. on January 6, to be presented to the jury.

¶ 32                                    B. The Trial

¶ 33    At trial, Henry Sutherland and Ashwin Patel both testified that they were working at the M&M Quick Mart store at 8:30 p.m. on December 29, 2011, when two masked men with guns entered the store. Mr. Sutherland testified that Officer Lewis, the store's security guard, said "police," and then one of the men jumped over the counter and started shooting, and Officer Lewis ended up on the ground. Mr. Sutherland later realized his own leg was hit with a bullet fragment. Mr. Patel testified that the man with the bigger gun jumped over the counter and shot Officer Lewis. Both witnesses testified that the two men took money from the register and the first man took Officer Lewis's gun. Neither saw the men's faces, and Mr. Patel said he did not see where the men fled or how they got away.

¶ 34    Sergeant Perez testified at trial and his testimony was substantively the same as his testimony at the hearing on the motion to suppress. The State also published portions of the ERI between Sergeant Perez, Detective Hillman, and Mr. Colon. Specifically, the State published the ERI from 9:53 p.m. to 10:41 p.m. on January 5, 2012, which included the entirety of Mr. Colon's initial explanation beginning at approximately 10:03 p.m. of what happened the night of the shooting.

¶ 35    ASA John Brassil testified that he interviewed Mr. Colon in the presence of Sergeant Perez at 3:28 a.m. on January 6, 2012, and the interview was recorded. The ERI between Mr. Colon and ASA Brassil was published to the jury and shows Sergeant Perez and ASA Brassil walking into the interview room and waking up Mr. Colon at 3:28 a.m. Mr. Colon starts off by saying he was "never intending to hurt anybody." ASA Brassil read Mr. Colon his *Miranda* rights one at a time, and Mr. Colon indicated he understood each right. Mr. Colon told ASA Brassil that he drove his fellow Spanish Cobra gang members Mr. Villa, Mr. Clay, and Mr. DeYoung to do a "lick"—or a

13

stickup—with the understanding that he would receive $10,000 to $15,000 of the proceeds for doing so. Mr. Colon detailed the route that they drove to the M&M Quick Mart and said that Mr. Villa and Mr. Clay both had guns and masks before they went into the store. Mr. Colon told the ASA that he stayed in the car in the alley and kept a lookout for police while Mr. Villa and Mr. Clay were in the store. Mr. Colon heard gunshots right before Mr. Villa and Mr. Clay got back into the car, and as soon as he was in the car, Mr. Villa shouted, "[d]ude was a f***ing cop." According to Mr. Colon, Mr. Villa explained that when they went into the store, the officer made a sudden movement and Mr. Villa "opened up on" the officer, meaning he shot the officer and then took the officer's gun, a gun which Mr. Villa then showed to Mr. Colon. Mr. Villa then yelled at Mr. Clay, calling him a "b***" for leaving the store first. Mr. Colon told ASA Brassil that he drove straight to his house, got out of the car, and had not talked to Mr. Villa, Mr. Clay, or Mr. DeYoung since. Mr. Colon also told ASA Brassil that he had been treated fairly by the detectives and that he had not been threatened or promised anything.

¶ 36    The only evidence directly implicating Mr. Colon, other than his own statements, was the grand jury testimony and several other pretrial statements to the police or the assistant state's attorney made by Mr. DeYoung. Mr. DeYoung recanted all of these statements in his trial testimony.

¶ 37    At trial, Mr. DeYoung claimed that he had lied to the grand jury and to the police and that, in fact, on December 29, 2011, he was at his mother-in-law's house with his family at 8:30 p.m., and then with his girlfriend at a hotel from 9:30 p.m. until 7 a.m. the following morning.

¶ 38    Mr. DeYoung testified that at some point during his ERI on January 6, 2012, the detectives left the room and he turned to the camera and said, "it was a lie." At trial, Mr. DeYoung insisted that his statement "it was a lie" to the ERI camera was because everything he said to the police

during the ERI was a lie.

¶ 39    Mr. DeYoung's grand jury testimony and portions of his ERI were admitted as substantive evidence. In his grand jury testimony, Mr. DeYoung testified at the grand jury that Mr. Villa's car, a Dodge Intrepid, pulled up at his front porch at approximately 8:10 p.m. on December 29, 2011. Mr. Colon was driving. Mr. DeYoung agreed to get in the car, and Mr. Villa said, "we got to hit a lick," which means to rob someone. Mr. Colon drove them to an alley in front of the M&M Quick Mart, then Mr. Clay and Mr. Villa got out of the car wearing skullcaps and walked toward the store. Mr. Colon and Mr. DeYoung stayed in the car, and Mr. DeYoung said Mr. Colon was acting nervous and "[l]ooking from side to side." Three to five minutes later, Mr. Clay and Mr. Villa ran back to the car. Mr. Villa said, "get out of here, go, go, go," and Mr. Colon quickly drove away. Mr. Villa then said, "I did all the work. I did everything. You didn't do s***," to Mr. Clay, and Mr. Clay responded, "[n]***, you see what I did. I took care of my business." Mr. Colon asked what happened. Eventually, Mr. Villa said, "we got a little something." During the drive, Mr. Villa took a large gun from a band around his neck and placed it on the floor of the car, then took another gun from his waist band and slid it to Mr. Clay, and Mr. Clay slid the gun into his own waist band. Mr. DeYoung then asked to be, and was, dropped off at home. Mr. DeYoung testified that he watched surveillance video from the M&M Quick Mart on December 29, 2011, and recognized Mr. Villa and Mr. Clay on the video as the offenders. Before the grand jury, Mr. DeYoung said his statement "it was a lie" to the ERI camera was actually the lie, and that he made that statement to the camera because he did not want to get Mr. Villa, Mr. Clay, or Mr. Colon in trouble.

¶ 40    In the portions of Mr. DeYoung's ERI that were published Mr. DeYoung told the detectives about going in a car to the M&M Quick Mart to commit a robbery with Mr. Villa, Mr. Clay, and Mr. Colon. The State also called as witnesses the detective and the assistant state's attorney who

interviewed Mr. DeYoung just before he testified before the grand jury. These witnesses testified that Mr. DeYoung's account to them mirrored his testimony before the grand jury.

¶ 41 The State also published video footage recorded by the M&M Quick Mart surveillance cameras from the night of December 29, 2011. Detective Anthony Noradin, who reviewed the footage, testified that one of the cameras showed a Dodge Intrepid going northbound in the alley immediately in front of the store, while other footage showed the two offenders entering the store and shooting Officer Lewis.

¶ 42 The State rested, and the defense then rested without presenting evidence.

¶ 43 The jury found Mr. Colon guilty of one count of first degree murder, two counts of armed robbery, and one count of aggravated battery with a firearm. The trial court sentenced Mr. Colon to 40 years in prison for the first degree murder, made a finding of severe bodily injury for the armed robbery of Officer Lewis and sentenced Mr. Colon to 22 years to run consecutive to the murder, sentenced Mr. Colon to another consecutive 22-year term for the armed robbery of Mr. Patel and to a concurrent 10-year term for the aggravated battery with a firearm, totaling 84 years in prison.

¶ 44                                  II. JURISDICTION

¶ 45 Mr. Colon was sentenced on October 6, 2017, and he timely filed his notice of appeal that same day. We have jurisdiction pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from final judgments of conviction in criminal cases.

¶ 46                                  III. ANALYSIS

¶ 47 Under *Miranda*, an individual subjected to custodial interrogation must be advised that he or she is entitled to have retained or appointed counsel present during questioning. *Miranda v.*

16

*Arizona*, 384 U.S. 436, 444-45 (1966). If a defendant requests counsel during a custodial interrogation, questioning must stop until counsel is provided or the defendant reinitiates questioning. *Edwards v. Arizona*, 451 U.S.477, 484-85 (1981); *In re Christopher K.*, 217 Ill. 2d 348, 376 (2005). As our supreme court summarized the law, "the bright line rule of *Edwards* [is] that all interrogation must cease when a suspect requests an attorney" and "that the accused may waive his right to counsel by himself initiating further communications, exchanges or conversations with the police." *People v. Hicks*, 132 Ill. 2d 488, 494 (1989).

¶ 48    Deciding whether the defendant invoked his right to counsel is an objective inquiry, which at a minimum requires some statement that can be reasonably construed as an expression of a desire for counsel. *Davis v. United States*, 512 U.S. 452, 459 (1994); *Christopher K.*, 217 Ill. 2d at 378. A reference to an attorney that would be understood as ambiguous or equivocal by a reasonable officer in the circumstances does not require that the questioning stop. *Davis*, 512 U.S. at 459; *Christopher K.*, 217 Ill. 2d at 378. The defendant's invocation of the right to counsel must be sufficiently free of indecision or double meaning so as to reasonably inform the authorities that the accused wishes to speak to counsel. *Id.* at 382. The suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459. On the other hand, there is no strict verbal formulation required to invoke the right, and a suspect "need not speak with the discrimination of an Oxford don." *Id.*

¶ 49    Once a defendant has expressed his desire to deal with the police only through counsel, he cannot be subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Edwards*, 451 U.S. at 484-85; *People v. Olivera,* 164 Ill. 2d 382, 389-90 (1995).

As the Supreme Court made clear in *Miranda* and reiterated in *Edwards*, " 'the interrogation must cease until an attorney is present.' " *Edwards*, 451 U.S. at 485 (quoting *Miranda,* 384 U.S. at 474). However, as the Court explained in *Edwards*, the interrogation can continue if "the accused himself initiates further communication, exchanges, or conversations with the police." *Id.*

¶ 50    In *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), the Supreme Court further defined what constitutes such an initiation by the defendant:

> "Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation. That the police officer so understood it is apparent from the fact that he immediately reminded the accused that 'you do not have to talk to me,' and only after the accused told him that he 'understood' did they have a generalized conversation." *Id.* at 1046.

¶ 51    Even if the defendant initiates a conversation after expressing the desire to deal with the police only through counsel, the burden remains on the State to show that subsequent events indicated the defendant also waived his fifth amendment right to have counsel present during the interrogation. *Bradshaw*, 462 U.S. at 1044. The question is whether the defendant's initiation of a conversation, coupled with the totality of the other circumstances, demonstrates a knowing and intelligent waiver of the right to counsel's presence during questioning. *Hicks*, 132 Ill. 2d at 493.

¶ 52    In other words, determining the admissibility of any statement made after the defendant has invoked the right to have counsel present during a custodial interrogation requires a two-part inquiry. The first step is to determine whether the defendant or the police reinitiated discussion

18

after the request for counsel. *Bradshaw*, 462 U.S. at 1064-65. Only if the impetus for further discussion came from the defendant do we proceed to the second step. *Id.* at 1065. The second step is to determine whether the totality of circumstances demonstrates that the defendant knowingly and intelligently waived his previously invoked right to counsel's presence during questioning. *Hicks*, 132 Ill. 2d at 493.

¶ 53    In this case, the trial court found that at 11:46 p.m. on January 5, 2012, Mr. Colon invoked his right to counsel and that all of the statements made before that time were admissible. Although neither party questions that factual finding, Mr. Colon contends that he actually invoked his right to counsel earlier than that—at 9:59 p.m., shortly after he was first given his *Miranda* warnings.

¶ 54    The trial court further found that Mr. Colon twice reinitiated conversation with the police after he invoked his right to counsel: once at 11:43 p.m. on January 5 and again at 12:26 a.m. on January 6. At 1:09 a.m. on January 6, Mr. Colon was again given *Miranda* warnings. The trial court ruled that all the statements that Mr. Colon made to the detectives and to the assistant state's attorney after 1:09 a.m. on January 6—which followed Mr. Colon's reinitiation and his indication that he again understood the *Miranda* warnings—were also admissible.

¶ 55    Mr. Colon's position is that the trial court erred in two respects. First, he contends that the statements he made between 9:59 p.m. and 11:46 p.m. on January 5, 2012, should have been suppressed because his first request for counsel occurred when, at 9:59 p.m., he said, "[m]an, I'm starting to say just f*** it, get me a lawyer man, 'cause—," which he argues would have been reasonably construed as an expression of a desire for counsel. Second, he contends that all the statements he made after he requested counsel should have been suppressed because the police never ceased questioning him, which he argues is a necessary predicate to him "initiating" further conversation with the police.

19

¶ 56    The State argues that the trial judge was correct in her findings that there was no invocation of rights until 11:46 p.m. and that Mr. Colon initiated further conversations with the police and thereafter voluntarily waived his right to have counsel present. The State also argues, in the alternative, that if the court erred in admitting those statements, the error was harmless beyond a reasonable doubt.

¶ 57    Review of a motion to suppress presents questions of both law and fact. *Christopher K.*, 217 Ill. 2d at 373. In determining whether a trial court has properly ruled on a motion to suppress, findings of fact and credibility determinations made by the trial court are accorded great deference and will be reversed only if they are against the manifest weight of the evidence. *People v. Slater,* 228 Ill. 2d 137, 149 (2008). We review *de novo*, however, a legal challenge to the trial court's ruling on a suppression motion. *Id.*; *People v. Harris*, 2012 IL App (1st) 100678, ¶ 45.

¶ 58    In reviewing the trial court's decision to allow the State to introduce significant portions of Mr. Colon's statements to the police, we need to consider two questions. First, when did Mr. Colon invoke his right to counsel? Second, after that invocation, did he initiate further conversation with the police and, if so, was his decision to waive the right to counsel after invoking it a voluntary one under the circumstances? We address these two issues in turn.

¶ 59            A. When Did Mr. Colon First Invoke His Right to Counsel?

¶ 60    The first point at which Mr. Colon contends he invoked his right to counsel was at 9:59 p.m. on January 5, 2012, when he said, "[m]an, I'm starting to say just f*** it, get me a lawyer man, 'cause," arguing that these words "reasonably informed the detectives that he wished to speak to counsel." The State responds that this "choice of words did not indicate an unequivocal request; indeed, he was merely dipping his toe into the water to see the reaction of the investigators with the overall goal to get himself out of the situation he was in. As such, it was reasonable for the

investigators to continue speaking with him."

¶ 61    When the trial court found this statement to be an ambiguous and equivocal request for counsel, it paraphrased Mr. Colon's statement as, "maybe I should get a lawyer." This is not what he said and the difference in word choice is significant. Courts have routinely found that the word "maybe" suggests an equivocal, rather than an unequivocal, request. See, *e.g.*, *Davis*, 412 U.S. at 462 ("[m]aybe I should talk to a lawyer" was *not* an unequivocal request for counsel and agents who interviewed the defendant were not required to stop the interrogation); *People v. Krueger*, 82 Ill. 2d 305, 308, 312 (1980) (finding that it was reasonable for the investigators to continue questioning the defendant after his statement alternately described as " '[m]aybe I ought to have an attorney,' " " '[m]aybe I need a lawyer,' " and " '[m]aybe I ought to talk to an attorney' ").

¶ 62    But Mr. Colon did not use the word "maybe." He said, "[m]an, I'm starting to say just f*** it, get me a lawyer, man, 'cause." His next sentence was: "I need a guarantee, man." There was no "maybe" in this statement. It was an affirmative request followed by "'cause" followed, in his next sentence, with the reason that he wanted a lawyer—to get a guarantee. As one of the justices in this case suggested at oral argument, this was similar to someone requesting a drink of water because he was thirsty.

¶ 63    The State argues that Mr. Colon's continuing engagement with the detectives, which it characterizes as "hoping to garner leniency," demonstrates that he "had no intention of seeking counsel." But this is belied by Mr. Colon's subsequent request for a public defender less than two hours later, which the trial court found—and the State does not now argue otherwise—was an unequivocal request for counsel. Moreover, we have recognized that a "[d]efendant's postrequest responses to further interrogation cannot be used to cast retrospective doubt on [an] earlier request for counsel." *People v. Harris*, 2012 IL App (1st) 100678, ¶ 72.

¶ 64     Mr. Colon's statement, "[m]an, I'm starting to say just f*** it, get me a lawyer man, 'cause" did not indicate uncertainty or hesitation, and he did not say maybe. His request was not equivocal or ambiguous—it was a request for counsel followed by a statement as to the reason that he wanted a lawyer. This request was completely ignored by the detectives who continued questioning Mr. Colon without honoring or even acknowledging this request. We find that Mr. Colon first invoked his right to counsel at 9:59 p.m. on January 5, 2012.

¶ 65     B. Did Mr. Colon Reinitiate Questioning and Voluntarily Waive His Right to Counsel?

¶ 66     As we have found that Mr. Colon invoked his right to counsel at 9:59 p.m., the question then becomes whether he reinitiated questioning and voluntarily waived his right to counsel at any point after that invocation such that statements following that reinitation would be admissible.

¶ 67     The trial court found that Mr. Colon reinitiated conversation about the investigation once at 11:53 p.m. on January 5 when Mr. Colon knocked on the door and said "[m]an y'all, I can't go to jail, man, these n**** will kill me, man"; and again at 12:46 a.m. on January 6, when returning from the bathroom he said, "[m]an, Al, just all I ask is to speak to him and see if—." The trial court ruled that these two reinitiations, together with the readministration of *Miranda* rights by Sergeant Perez at 1:08 a.m., were a sufficient basis on which to find that Mr. Colon voluntarily waived his right to counsel in reference to any statements he made after that point. If this is correct, then regardless of when Mr. Colon first invoked his right to counsel, his detailed statement to ASA Brassil at 3:28 a.m. on January 6, 2012, was properly admitted.

¶ 68     Mr. Colon argues that the detectives never ceased their interrogation of him and that therefore there could have been no reinitation of interrogation. Mr. Colon relies on our decision in *Harris*, 2012 IL App (1st) 100678, ¶¶ 72-74, in which we said that questioning "should have ceased" when the defendant requested a lawyer and that because "there was no indication" that an

attorney would be provided in response to her request, she did not waive her fifth amendment right to counsel. The State, arguing in support of the trial court's finding that Mr. Colon reinitiated conversation about the crime, relies on *People v. Mandoline*, 2017 IL App (2d) 150511, ¶¶ 26-29, 107-108, 113, in which this court found admissible certain statements the defendant made after he reinitiated conversation with the police, despite the police "steamrolling over" the defendant's first request for counsel. While we do not find either of these cases to be directly on point, we agree with Mr. Colon that the questioning needed to stop and the detectives needed to acknowledge and honor his request for counsel before there could be a reinitiation of the conversation such that later statements he made would be admissible.

¶ 69    It is clear from our review of the entire ERI that, while there were periods that Mr. Colon was left alone and a couple of instances in which he knocked on the door of his interrogation room because he needed something from the detectives, this interrogation never stopped in recognition of either of Mr. Colon's requests for counsel. Rather, throughout the many hours that Mr. Colon spent in the interrogation room, detectives went in and out, and the subjects ranged from food and cigarettes, to the crime investigation, to Mr. Colon's fear of jail and his fear of his fellow gang members. At no time did the detectives suggest to Mr. Colon that they would provide counsel or that they could not question him further because he had requested counsel. And Mr. Colon never said anything that suggested he had changed his mind about wanting a lawyer. In fact, when he was reminded of his right to counsel at 1:09 a.m. on January 6, when Sergeant Perez readministered the *Miranda* rights, Mr. Colon said, "[y]eah. That's what I kind of—" and he was cut off. In short, while the interrogation was on and off for the many hours that Mr. Colon spent in the interrogation room, it never ceased because of, or in response to, his request for counsel.

¶ 70    The State has provided us with no case that suggests that this scenario supports the trial

23

court's finding that Mr. Colon reinitiated questioning. The State's reliance on *Mandoline* appears misplaced. In that case, once the defendant's invocation of his right to counsel *was* recognized, "questioning ceased. After that point, no one asked [the] defendant to make a statement before [the] defendant reinitiated the discussion about the case." *Mandoline*, 2017 IL App (2d) 150511, ¶ 107. We specifically observed that "the detectives *terminated the questioning* and left the interview room." (Emphasis added.) *Id.* ¶ 26. We also noted that, "[t]he detectives told defendant that they could not speak with him about the investigation, because he had requested an attorney." *Id.* ¶ 104. This is in stark contrast to what happened here, where the detectives never even acknowledged that Mr. Colon had requested a lawyer or suggested to him that they would stop questioning him in light of that request.

¶ 71    *Harris* is not directly on point since our focus there was on whether there was a custodial interrogation and whether the defendant had unambiguously invoked her right to counsel. 2012 IL App (1st) 100678, ¶¶ 52-77. We did not discuss the issue of whether the defendant reinitiated questioning. However, *Harris* does recognize that the premise of *Miranda* is that when an accused invokes his right to counsel, the interrogation needs to stop. *Id.* ¶ 69. Indeed, while the supreme court in *Edwards* recognized that after a request for counsel, the interrogation can continue if "the accused himself initiates further communication, exchanges, or conversations with the police," it also reaffirmed that the backbone of *Miranda* is that " 'the interrogation must cease until an attorney is present.' " 451 U.S. at 485 (quoting *Miranda*, 384 U.S. at 474). We also recognized this in *Mandoline*, because the only statements that were admitted were the ones that the defendant made after questioning had ceased in response to his request for counsel and then was reinitiated by the defendant. 2017 IL App (2d) 150511, ¶¶ 46, 113.

¶ 72    The interrogation here was not terminated in response to either of Mr. Colon's requests for

counsel. Where there is no termination, there can be no reinitiation by the defendant. Because we have found that Mr. Colon's first request for counsel was at 9:59 p.m. any statements made after that were in violation of his *Miranda* rights and were erroneously admitted at trial.

¶ 73                                                    C. Harmless Error

¶ 74    Having found Mr. Colon's statements were admitted in error, we must consider whether that error was harmless. "In determining whether a constitutional error is harmless, the test to be applied is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). Our supreme court has suggested that three different approaches exist for determining whether a constitutional error is harmless: "(1) focusing on the error to determine whether it might have contributed to the conviction, (2) examining other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determining whether the improperly admitted evidence is merely cumulative." *Id.* Our supreme court has also noted that because "[c]onfessions carry extreme probative weight, *** the admission of an unlawfully obtained confession rarely is harmless." (Internal quotation marks omitted). *People v. St. Pierre*, 122 Ill. 2d 95, 114 (1988).

¶ 75    This case does not present one of the rare instances where the admission of the unlawfully obtained confession was harmless. First, the strongest evidence of Mr. Colon's guilt presented by the State was, by far, his video-recorded confessions admitting to being the driver. Notably, the import of Mr. Colon's recorded statements was made clear by the State's use of them in closing argument, replaying portions to the jury and arguing that Mr. Colon "hung himself" with his statements. And, as we observed above, the only evidence presented at trial that directly implicated Mr. Colon aside from his own statements was the grand jury testimony of Mr. DeYoung.

¶ 76    The State maintains that Mr. DeYoung's grand jury testimony and ERI were a sufficient

25

basis on which the jury could have convicted Mr. Colon because the identification of a single eyewitness is sufficient to sustain a conviction (citing *People v. Austin*, 2017 IL App (1st) 142737, ¶ 67). The State's reference to this principle of law, however, ignores that, as our supreme court has put it, "[i]t remains the firm holding of this court that the testimony of a single witness, *if positive and credible*, is sufficient to convict." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Here, Mr. DeYoung's testimony fell far short of being credible: he claimed that he lied, lied about lying, and did not lie about lying, ultimately testifying at trial that his statement to the police and his testimony before the grand jury were lies and that he was not present at the liquor store the night of the shooting. The State argues that Mr. DeYoung's statement was supported by the physical evidence, but the only physical evidence introduced was shell casings from three guns—Officer Lewis's plus two more—and the M&M Quick Mart surveillance video. This evidence corroborates Mr. DeYoung's account of Mr. Villa and Mr. Clay going into the store but does nothing to bolster his statement about Mr. Colon driving.

¶ 77   In addition, for the first time at oral argument, the State argued that the admission of Mr. Colon's ERI statements was harmless error because Sergeant Perez would still be able to testify about Mr. Colon's statement to him at 9:40 p.m. on January 5 about being the driver, which was not recorded because it was given when the detectives thought Mr. Colon was a third-party witness, rather than a suspect. But all that Sergeant Perez testified to is that Mr. Colon told him that he had lied and he was the driver. Mr. Colon's recorded ERI statements, in which he detailed how he drove Mr. Villa and Mr. Clay to rob a liquor store knowing that they were armed with guns, are far more persuasive and far more incriminating. These statements are in no sense equivalent.

¶ 78   The State has not carried its burden of showing harmless error. The admission of Mr. Colon's statements contributed to his conviction, the remaining evidence at trial was not

overwhelming, and the improperly admitted evidence was not merely cumulative. *Patterson*, 217 Ill. 2d at 428. As the admission of Mr. Colon's statements was not harmless error, we find it necessary to reverse Mr. Colon's conviction and remand the case for a new trial.

¶ 79                                            IV. CONCLUSION

¶ 80     Because we find that Mr. Colon unequivocally invoked his right to counsel before he made any recorded incriminating statements, and that the police failed to honor his invocation by ceasing the interrogation such that Mr. Colon could reinitiate his interrogation, we find that the trial court erred in denying Mr. Colon's motion to suppress all of his recorded statements. Because we find that the admission of his statements was not harmless error, we reverse Mr. Colon's conviction and remand this case for a new trial.

¶ 81     Reversed and remanded.